**STERLING DRUG INC., George A. Breon & Company and Breon Laboratories, Inc., Plaintiffs-Appellants,**

v.

**LINCOLN LABORATORIES, INC., Defendant-Appellee.**

No. 13893.

United States Court of Appeals
Seventh Circuit.

Sept. 30, 1963.

Mercer L. Stockell, New York City, James M. Winning, Springfield, Ill., W. Hubert Plummer, New York City, James F. Hoge, Lenore B. Stoughton, New York City, of counsel, for appellants.

Carl R. Miller, Decatur, Ill., John D. Dewey, Chicago, Ill., for appellee.

Before HASTINGS, Chief Judge, and CASTLE and SWYGERT, Circuit Judges.

CASTLE, Circuit Judge.

Plaintiffs-appellants, Sterling Drug Inc., George A. Breon & Company, and Breon Laboratories, Inc., brought this action in the District Court against Lincoln Laboratories, Inc., defendant-appellee, charging trademark infringement and unfair competition based on defendant's use of the word DYPRIN as a trademark identifying its medicinal product for prevention of diaper rash. Plaintiff Sterling is the owner of the registered trademark DIAPARENE.[1] George A. Breon & Company was the marketing subsidiary for Sterling's DIAPARENE products until it was succeeded as such by Breon Laboratories, Inc. The Plaintiffs sought an injunction, an accounting of defendant's profits, and treble damages. The District Court, following a trial on the merits, made and entered findings of fact and conclusions of law on the basis of which it granted judgment for the defendant. Plaintiffs appealed.

The main contested issue presented by plaintiffs' appeal is whether the District Court's conclusion that the evidence adduced fails to establish the "likelihood of confusion" requisite to plaintiffs' right to relief represents the application of correct legal criteria to the court's factual findings.

The following summary is limited to those facts established by the record which are pertinent to the resolution of the issue above delineated and to consideration of additional points of contention which merit but brief comment.

The record discloses that with one exception plaintiffs' products marketed under the DIAPARENE trademark are sold for the purpose of treating and preventing infant diaper rash (ammonia dermatitis) and the similar condition afflicting adults who are unable to control urination. Ammonia dermatitis is caused by urine on the skin and in diapers, bed clothes, bed linens and other linens. The DIAPARENE products are designed to prevent ammonia dermatitis through the use of the antiseptic methyl benzethonium chloride to retard bacterial decomposition of urine and consequent release of free ammonia. Other ingredients are incorporated to soothe and reduce irrita-

1. The trademark DIAPARENE was registered by Homemakers' Products Corporation on the Principal Register of the United States Patent Office under No. 529,343 on August 22, 1950, for an antiseptic chemical in Class 18, Medicines and Pharmaceutical preparations. Sterling Drug Inc. acquired it from Homemakers' in 1957.

tion. The products are in the form of an ointment, a creme, a lotion, and a dusting powder intended for direct application to the skin; a rinse solution and pre-crushed tablets for making such solution, in which diapers and linens are rinsed; and a sudsing cleanser containing hexachlorophene recommended for use to cleanse and de-germ the skin prior to application of the other products. The one exception, Cradol, contains methyl benzethonium chloride in an emulsified base and is sold for use in the prevention and treatment of cradle cap and dandruff.

Defendant's DYPRIN is a powder sold in capsule form to be taken internally. The capsule may be taken orally intact or opened and the contents dissolved in a liquid carrier such as a baby's formula. DYPRIN is designed to treat and prevent ammonia dermatitis through the use of an amino acid, dl methionine, taken internally, to reduce the ammonia content of the urine to a level which prevents diaper rash or its related condition in adults.

The DIAPARENE products are sold through normal drug channels—drug wholesalers and retailers—and to hospitals and nursing homes. No prescription is required for their purchase and most of the sales are over-the-counter sales to the public by drug stores. The products have been widely advertised and promoted. Annual sales approximate $2,000,-000 and annual advertising expenditures are approaching $400,000. The products have been heavily promoted to the medical and nursing professions and to hospitals and other institutions. Doctors rarely purchase the products but many purchases are made on the recommendation of doctors, nurses and pharmacists.

Defendant's DYPRIN product is sold primarily to physicians and drug stores but also to hospitals and nursing homes. A substantial number of the purchasing physicians are dispensing physicians. Defendant has confined promotion of its product to physicians and pharmacists. Sales of DYPRIN amount to less than $10,-000 annually and are mostly in the midwest although the product is distributed nationally. Defendant's president testified that there was no reason why the manner in which DYPRIN is promoted could not be changed to promote sales to the general public.

The users of the DIAPARENE and DYPRIN products are the same class of persons—those caring for infants and adults afflicted with ammonia dermatitis, whether at home or in hospitals, nursing homes or other institutions.

Defendant commenced the sale of its DYPRIN product in September or October, 1958.

Prior to 1958 the DIAPARENE line of products with the exception of the sudsing skin cleanser (Todl) had been sold by Homemakers' Products Corporation the then owner of the registered trademark DIAPARENE. On November 6, 1957, plaintiff Sterling Drug Inc. acquired the assets and business of Homemakers' as a going concern, including good will and the registered trademark DIAPARENE. Sterling added the sudsing skin cleanser (Todl) to the DIAPARENE line in 1961. The DIAPARENE dusting powder has been manufactured for plaintiffs by Sterling's wholly owned subsidiary Cook-Waite Laboratories, Inc. Since their acquisition from Homemakers' all of the other DIAPARENE products have been manufactured by Sterling, and Sterling manufactures the sudsing skin cleanser which it added to the line. Sterling commenced manufacture of the products sometime during the first six months of 1958. Prior to that time they had been manufactured by Homemakers' contract manufacturers Norwich Chemical Co. and Orlin Laboratories. Until December 31, 1960, the George A. Breon & Company, a wholly owned marketing subsidiary of Sterling Drug Inc., was its licensee for the sale and distribution of the DIAPARENE products. The name of the subsidiary, not Sterling's, appeared on the labels bearing the trademark. In January, 1961, Breon Laboratories, Inc., also a wholly owned subsidiary of plaintiff Sterling, became such licensee and marketing subsidiary.

The labels used on the products by Breon & Company as licensee and mar-

keting subsidiary of Sterling contained the word "Chloride" in association with DIAPARENE (either following or below) as an identification of the antiseptic chemical methyl benzethonium chloride.

Defendant's president testified that he was aware of plaintiffs' DIAPARENE products when he selected the DYPRIN mark for defendant's product; that of other marks reviewed the "one we were most concerned about" was DIAPARENE; and that the proposed mark DIAPRIN was rejected for the reason that "[w]e felt that was too close."

The conclusion of the District Court that "the Defendant's trademark is not a colorable imitation of the prior trademark Diaparene, and when used on or in connection with the sale, advertising or offering for sale of Defendant's product is not likely to cause confusion and mistake and to deceive purchasers as to the identity and source of origin of Defendant's product, and to divert the benefit of the business reputation and good will symbolized by the trademark Diaparene" is based on the court's findings which point up the differences between plaintiffs' and defendant's marks and between their products. The content of those findings characterize these differences as dissimilarity in the appearance and pronunciation of the marks, the packaging of the products, the wholesale and retail unit prices, the physical form of the products, the manner of their administration or application, the medicinal ingredients and properties, and the source from which the consumer receives them. We agree with the District Court that there are differences, which reasonably serve the user in identifying or distinguishing the products—not mistaking one for the other. But the conclusion of the District Court fails to recognize and give effect to the points of similarity which when considered in their totality establish likelihood of confusion as to the *source of origin* of the product on the part of the purchaser or user.

On the facts here involved the similarity in appearance and sound of these coined terms, DIAPARENE and DY-PRIN, which are non-descriptive and in themselves without definitive meaning although they may connote some association with diapers, far outweigh the differences which studied attention or precise and careful enunciation may reveal. Such side-by-side comparison is not the correct test; it is the purchasing public's state of mind when confronted by somewhat similar trade names *singly* presented. G. D. Searle & Co. v. Chas. Pfizer & Co., 7 Cir., 265 F.2d 385, 388; Northam Warren Corporation v. Universal Cosmetic Co., 7 Cir., 18 F.2d 774, 775. The products involved are designed to remedy the same condition in the same classes of persons—infants and adults afflicted with ammonia dermatitis. The products are purchased and used by the same class of persons—those who care for infants and such adults in the home or in hospitals, nursing homes or other institutions. Both products are available for purchase from retail drug outlets. Plaintiffs' products are often purchased on the recommendation of physicians, nurses or pharmacists. That a substantial portion of defendant's somewhat limited distribution of its product represents sales to physicians who directly dispense it, and that it is often bought on prescription issued by a physician, do not serve to assure elimination of the likelihood of confusion as to *source of origin* which the other factors precipitate. It would be normal for both those who prescribe or recommend DYPRIN and those who use it to infer that its source of origin is that of the related product DIAPARENE, a product available in more than one form.

The defendant itself recognized DIA-PRIN as too close to plaintiffs' DIAPARENE. But it merely dropped a syllable which is subject to slurring in casual speech and adopted DYPRIN instead. Defendant's own appraisal afforded a prima facie presumption foreclosing its right to DYPRIN. Cf. My-T Fine Corporation v. Samuels, 2 Cir., 69 F.2d 76, 77, where Judge Learned Hand pointedly observed:

"But when [intent] appears, we think that it has an important procedural result; a late comer who

deliberately copies the dress of his competitors already in the field, must at least prove that his effort has been futile. Prima facie the court will treat his opinion so disclosed as expert and will not assume that it was erroneous.

\* \* \* \* \* \*

" \* \* \* such an intent raises a presumption that customers will be deceived."

■ The basic issue involved in a suit such as this for trademark infringement and unfair competition is whether the defendant's mark as used by it is likely to cause confusion or mistake as to the source of the product—likely to deceive purchasers as to the source of origin of the product—cause them to attribute the product to the plaintiff. Philco Corporation v. F. & B. Mfg. Co., 7 Cir., 170 F.2d 958; Independent Nail & Packing Co. v. Stronghold Screw Products, Inc., 7 Cir., 205 F.2d 921.

■ It is our conclusion that the District Court in arriving at its conclusion that no likelihood of confusion existed failed to apply the correct legal standards and grounded its conclusion on irrelevant differences between the products involved, promotional activities employed, and source of the user's inducement to purchase or use the product—through prescription or recommendation of a physician or otherwise. The court erred in its conclusion on the issue of likelihood of confusion.

■ We have considered the arguments advanced by the defendant in support of its contention that the use of the word "Chloride" in association with DIAPARENE on labels of the products and such use in literature as an identification for methyl benzethonium chloride constituted diluting and generic uses which limit the scope of the trademark DIAPARENE and of the protection to which plaintiffs are entitled. We are of the opinion that such contention is without merit. The record here supports no finding that DIAPARENE has become identified in the public mind as meaning no more than methyl benzethonium chloride. Cf. American Chicle Co. v. Topps Chewing Gum, Inc., 2 Cir., 208 F.2d 560, 562. The District Court did not so find. Any such finding would have been clearly erroneous. And, the District Court's conclusions that the use of the word "Chloride" limits the scope of the trademark and of the protection available to plaintiffs are without support in law.

■ The defendant urges that a failure of proof of exercise of control by plaintiff Sterling with respect to the quality of products bearing its DIAPARENE trademark which were sold and distributed by Sterling's wholly owned subsidiary and licensee, the George A. Breon & Company, under the latter's name, precludes relief to plaintiffs in enforcement of the trademark. In this connection defendant relies on the provisions of 15 U.S. C.A. §§ 1055 and 1127 concerning the use of registered trademarks by a related company, which is defined as one controlled by the registrant in respect to the nature and quality of the goods in connection with which the mark is used. But the record here shows that commencing in 1958 Sterling itself manufactured all of the DIAPARENE products with the exception of the dusting powder which was manufactured by Cook-Waite Laboratories, Inc., a wholly owned subsidiary of Sterling. The situation here is not analogous to that referred to in Dawn Donut Company, Inc. v. Hart's Food Stores, Inc., 2 Cir., 267 F.2d 358, cited by defendant, as working an abandonment of the registration—a naked system of licensing without exercise of control over the nature and quality of the products to be sold under the trademark. Nor is Alligator Company v. Robert Bruce, Inc. (1959), D.C.E.D.Pa., 176 F.Supp. 377, relied upon by defendant, of significant import on the factual situation here presented. In Alligator the mere existence of a license agreement in which the licensee agreed to maintain the quality position of the product, and to inspection for the purpose of assuring compliance, was held insufficient of itself to be so finally and conclusively determinative of

the status of the registrant and the licensee as related companies as to authorize entry of summary judgment, but that a factual issue as to what actually was done under such agreement was present. The licensee in Alligator was not a wholly owned subsidiary of the registrant, and the registrant neither manufactured nor supplied the product.

The District Court's conclusion that failure of proof of exercise of product quality control by Sterling constituted a basis for dismissal of the plaintiffs' action is erroneous as a matter of law.

We find no basis for disturbing the District Court's finding and conclusion that there is no evidence that defendant has caused injury to plaintiffs' business or good will. There is nothing in the record which would sustain an award of monetary damages to any of the plaintiffs and entitle any of them to the accounting sought in that connection. But, for the reasons heretofore given, the plaintiffs Sterling Drug Inc. and Breon Laboratories, Inc. are entitled to injunctive relief to prevent defendant's further use of DYPRIN in connection with a diaper rash product and to preclude such use of any other colorable imitation of the trademark DIAPARENE.

A motion of the defendant to dismiss this appeal was taken with the case. The motion is grounded on an alleged failure of plaintiffs to comply with Rule 16(b) of this Court in the preparation of the Appendix filed in this appeal. Plaintiffs were granted leave to file a Supplementary Appendix. In view of this, and of the fact that our examination of the Appendix does not reveal grounds which warrant application of the drastic remedy of dismissal of the appeal, expressed by way of admonition in Potomac Insurance Company v. Stanley, 7 Cir., 281 F.2d 775, and applied under the aggravated circumstances present in Morrison v. Texas Company, 7 Cir., 289 F.2d 382; Cf. Sparrow v. Yellow Cab Co., 7 Cir., 273 F.2d 1, the motion to dismiss the appeal is denied.

The judgment order of the District Court is reversed and the cause is remanded with directions to enter a judgment granting appropriate injunctive relief to plaintiffs Sterling Drug Inc. and Breon Laboratories, Inc.

Reversed and remanded with directions.