**SOURCE SERVICES CORP., Plaintiff,**

v.

**CHICAGOLAND JOBSOURCE,
INC., Defendant.**

No. 85 C 10032.

United States District Court,
N.D. Illinois, E.D.

Sept. 18, 1986.

Floyd Mandell, Kirk Hartley, Katten, Muchin, Zavis, Pearl, Greenberger & Galler, Chicago, Ill., for plaintiff.

Franklin Lunding, Biggam, Cowan, Marquardt & Lunding, Chtd., Chicago, Ill., for defendant.

## MEMORANDUM OPINION AND ORDER

SHADUR, District Judge.

Source Services Corporation ("SSC") sues Chicagoland JobSource, Inc. ("CJ"),[1] claiming:

1. servicemark[2] infringement under Lanham Act § 32(1)(a), 15 U.S.C. § 1114(1)(a) ("Section 1114(1)(a)"[3]) (Count I);

2. false designation of origin under Lanham Act § 43(a), Section 1125(a) (Count II);

3. common law unfair competition (Count III);

4. violations of:

(a) Illinois Deceptive Trade Practices Act § 2, Ill.Rev.Stat. ch. 121½, ¶ 312 and

(b) Illinois Consumer Fraud and Deceptive Business Practices Act ("Consumer Fraud Act") §§ 2 and 10a, Ill. Rev.Stat. ch. 121½, ¶¶ 262 and 270a (Count IV); and

5. servicemark dilution under Illinois' trademark registration act ("Antidilution Act"), Ill.Rev.Stat. ch. 140, ¶ 22 (Count V).

SSC has now moved under Fed.R.Civ.P. ("Rule") 56 for summary judgment as to all counts. For the reasons stated in this memorandum opinion and order, that motion is denied.

### Facts[4]

SSC's business is "job placement and employment opportunity consultation" (Weiss Aff. ¶ 5). Its customers are primarily companies seeking employees with certain specialized skills (id. ¶ 6). Currently those skills include data processing, computer programming, finance and engineering (id.). SSC publishes several recruiting guides (aimed at personnel directors) and job opportunity listings (aimed at job seekers) (see id. Group Ex. 2).

Since 1966 SSC[5] has used the word "source," either alone or in combination with other words, as a servicemark (id. ¶ 2). It has registered several marks with the U.S. Patent and Trademark Office ("Patent Office"), including (id. Group Ex. 1):

1. SOURCE EDP (filed 1966);

---

1. Because this is an infringement case, it is particularly important at the outset to avoid loading the dice (toward either naturals or craps) through a misleading depiction of CJ's name (which is also its mark). SSC's briefs (emphasizing the asserted point of infringement) call CJ "JobSOURCE," while CJ's own brief (perhaps seeking to deemphasize that same point) uses the form "JOBSOURCE." Neither version tracks the actual business usage reflected in CJ's letterhead (Saunders Dep. Ex. 9), masthead (see, e.g., id. Ex. 1) and advertising literature (see, e.g., id. Ex. 3), all of which use "JobSource."

2. SSC accurately characterizes its marks as "servicemarks" rather than "trademarks" (see 15 U.S.C. § 1127). Of course the infringement test is the same either way (Boston Professional Hockey Ass'n, Inc. v. Dallas Cap & Emblem Mfg. Inc., 510 F.2d 1004, 1009 (5th Cir.), cert. denied, 423 U.S. 868, 96 S.Ct. 132, 46 L.Ed.2d 898 (1975)). SSC is less precise in speaking of CJ's mark, sometimes referring to trademark usage (see, e.g., SSC Mem. 7) and sometimes to CJ's claimed servicemark use (see, e.g., SSC Mem. 9).

Though the legal standard of infringement is identical, a defendant's difference in usage may be of more than semantic significance in infringement disputes (see n. 12).

3. All further Lanham Act references will also take the form "Section—," citing to Title 15's numbering rather than to the Lanham Act's internal numbering.

4. Rule 56 principles impose on the party moving for summary judgment the burden of establishing the lack of a genuine issue of material fact (Celotex Corp. v. Catrett, — U.S. —, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986)). For that purpose this Court must view the evidence in the light most favorable to the nonmovant—in this case CJ (Anderson v. Liberty Lobby, Inc., — U.S. —, 106 S.Ct. 2505, 2513, 91 L.Ed.2d 202 (1986)).

5. For simplicity's sake "SSC" will be used to describe the present corporation and its related corporate predecessors in the ownership and use of the marks.

2. source edp (with design) (filed 1966);

3. SOURCE FINANCE (filed 1975);

4. MANAGEMENT SOURCE (filed 1980); and

5. SOURCE (filed 1984).

Under Lanham Act § 15, Section 1065, the first three listed marks have become incontestable (*id.* ¶ 3). On April 1, 1986 SSC acquired the mark "TEMP SOURCE" from its original registrant (*id.*). Another mark, "Source Engineering [with design]" has recently received Patent Office approval for registration (*id.* ¶ 3 and Group Ex. 1, at 8).

SSC is the "oldest and largest placement firm of its kind in the United States" (*id.* ¶ 8). It has over 80 offices and has sold "millions of dollars worth" of its services in the Chicago area alone (*id.*). Each year since 1980 SSC has spent over $4 million on national advertising on television and radio and in newspapers and trade journals (*id.* ¶ 7). Overall SSC has spent "millions of dollars" advertising and promoting its marks in the Chicago area (*id.*).

CJ was founded in February 1985 by Ronald Saunders ("Saunders") (Saunders Dep. 7). Saunders had worked for a general-interest Chicago suburban newspaper and conceived the idea of publishing a local version of the *National Business Employment Weekly* (*id.* 11–13). At his suggestion the new publication was named *The Chicagoland JobSource* ("*The JobSource*") (*id.* 8–9).

Following a tabloid format, *The JobSource* principally contains display advertising by employers seeking job applicants. In most cases the ads direct prospective applicants to communicate directly with the advertiser, though *The JobSource* does offer a standard "box number" service (*id.* Ex. 10). Space not devoted to advertising contains articles on job hunting and the job market, culled for the most part from the wire services (see, e.g., Saunders Aff. Ex. 3). More than 60% of *The JobSource*'s gross revenues come from display advertising (Saunders Dep. 21), the balance coming from newsstand and subscription sales (*id.* 22).

CJ published the first issue of *The Job-Source* in August 1985 (Saunders Aff. ¶ 2). At first its masthead featured (in addition to the publication's name) the slogan "Your Weekly Source to Find a Job or Fill a Job" (*id.* Ex. 1). However, beginning with the May 19, 1986 issue that masthead slogan has not been used (*id.* Ex. 3). According to Saunders, a new layout was adopted at that time "to provide a more striking visual appearance to the newspaper," and "space limitations" created by the new layout dictated the slogan's removal (*id.* ¶¶ 3–4). At all times since August 1985 CJ has used a characteristic typeface and color scheme on *The JobSource*'s masthead, along with a "T.M." symbol (see *id.* Exs. 1–3).

In June 1985—before publishing its first issue—CJ's attorney commissioned Berger & Altman ("B & A"), a trademark research firm, to research prior registrations of the names "Chicagoland JobSource" and "Job-Source" (Saunders Dep. Ex. 8). B & A reported its research revealed seven marks in which the terms "Chicagoland," "Job" or "Source" were used, but it mentioned none of SSC's marks (*id.*). Saunders Dep. 35 says he first heard of SSC's marks through an August 16, 1985 letter from SSC's attorneys, one week after *The JobSource*'s first publication date (*id.* 35–36). That letter (*id.* Ex. 2) said SSC regarded *The JobSource* as an infringement of its marks and "encourage[d]" CJ to change its mark to avoid legal action. CJ took no steps in response (*id.* 37). This lawsuit followed December 2, 1985.

### Lanham Act Claims [6]

SSC R. Mem. 7 accurately sums up what its motion puts at issue:

Disney Productions, 787 F.2d 1163, 1173–74 (7th Cir.1986)). Thus no separate discussion of those claims is necessary. *James Burrough*, 540 F.2d at 274 n. 16 also suggests no separate Antidilution Act analysis is required, but *McGraw-Edison*, 787 F.2d at 1174 says dilution

---

**6.** This opinion's Lanham Act analysis applies with equal force to SSC's common-law unfair competition claim (*James Burrough Ltd. v. Sign of the Beefeater, Inc.,* 540 F.2d 266, 274 n. 16 (7th Cir.1976)) and its Illinois Deceptive Trade Practices Act claim (*McGraw-Edison Co. v. Walt*

As plaintiff will demonstrate, there are only two issues which are central to plaintiff's Motion For Summary Judgment, i.e. 1) does plaintiff have valid rights in its SOURCE marks, and if so, 2) is defendant's use of JobSOURCE likely to result in confusion, mistake or deception with [sic] plaintiff's use of its SOURCE marks.

Because CJ does not assert invalidity of any of SSC's marks,[7] likelihood of confusion remains as the only real Lanham Act issue.[8] Just last week *Ziebart International Corp. v. After Market Associates, Inc.*, 802 F.2d 220, 225 (7th Cir.1986) has reconfirmed that as the "key question":

> The "key question" in determining whether there has been infringement under federal trademark law (the Lanham Act, specifically 15 U.S.C. § 1114(1)) is whether there is likelihood of confusion by the consuming public.

And *McGraw Edison*, 787 F.2d at 1167–68 (citations—other than sources of quoted language—omitted) has recently spoken at length on that subject:

> McGraw-Edison has asserted claims against Disney and Bally under sections 32 and 43 of the Lanham Act of 1946, 15 U.S.C. §§ 1114, 1125; both sections require that a plaintiff demonstrate that the defendant has created a likelihood of confusion as to the origin of his prod-

uct.... "Whether or not there is a likelihood of confusion is a question of fact as to the probable or actual actions and reactions of prospective purchasers of the goods or services of the parties. A variety of factors may be material in assessing the likelihood of confusion." *American International Group [, Inc. v. London American International Corp.,]* 664 F.2d [348,] 351 [ (2d Cir. 1981) ].... In determining likelihood of confusion, this circuit has considered several factors to be important:

> "the degree of similarity between the marks in appearance and suggestion; the similarity of the products for which the name is used; the area and manner of concurrent use; the degree of care likely to be exercised by consumers; the strength of the complainant's mark; actual confusion; and an intent on the part of the alleged infringer to palm off his products as those of another."

*Helene Curtis [Industries, Inc. v. Church & Dwight Co.,]* 560 F.2d [1325,] 1330 [ (7th Cir.1977), *cert. denied*, 434 U.S. 1070, 98 S.Ct. 1252, 55 L.Ed.2d 772 (1978) ] (quoting *Carl Zeiss Stiftung v. VEB Carl Zeiss Jena*, 433 F.2d 686, 705 (2d Cir.1970), *cert. denied*, 403 U.S. 905 [91 S.Ct. 2205, 29 L.Ed. 680].... "None of these factors by itself is dispositive of

---

is a different issue with a test of its own. This opinion will therefore treat separately with that claim.

7. As to the marks that have become incontestable under Section 1065 ("SOURCE EDP," "source edp [with design]" and "SOURCE FINANCE"), only narrow lines of attack would remain in any event under Lanham Act § 33(b), Section 1115(b). See *Park 'N Fly, Inc. v. Dollar Park and Fly, Inc.*, 469 U.S. 189, 105 S.Ct. 658, 83 L.Ed.2d 582 (1985). Those three marks, however, are obviously not SSC's best bets on the likelihood-of-confusion issue (see, e.g., n. 10).

8. CJ would like to foreclose even that question. Its Mem. 1 urges *Source Services Corp. v. Source Telecomputing Corp.*, 635 F.Supp. 600 (N.D.Ill. 1986) mandates denial of SSC's motion. There SSC sued another company using "source" in its name and, as it has here, moved for summary judgment. This Court's colleague Judge Ilana Rovner denied SSC's motion, finding material fact issues as to likelihood of confusion. But

confusion is by nature relative. Saying "A is (or is not) likely to be confused with B" says something about the characteristics of both A and B and the way those characteristics interact in the public eye. Thus such a conclusion is not dispositive of the question whether A is likely to be confused with C—unless, that is, B and C are identical. Nothing would really be gained here, and clarity would likely be lost, by focusing on the B–C relationship (looking for points of identity) rather than the A–C relationship (looking for likelihood of confusion). That is especially true here, because *Source Services* did not *rule* on likelihood of confusion. It merely held there were factual issues requiring trial. Whether or not factual issues exist to bar summary judgment is in large part dependent on the factual record the parties have presented. Record deficiencies in one case may be remedied in another very similar case—though, as this opinion will show, that has not happened here.

the likelihood of confusion question, and different factors will weigh more heavily from case to case depending on the particular facts and circumstances involved." *Marathon Mfg. Co. v. Enerlite Products Corp.*, 767 F.2d 214, 218 (5th Cir.1985). In fact, this court has reversed lower court decisions that have placed excessive importance on certain factors.

SSC's motion stems from a fundamental misconception: It points to a few cases and says (Mem. 14) likelihood of confusion "is generally treated as a question of law," thus wholly ignoring the essentially fact-bound nature of the inquiry. But *McGraw-Edison*, in the just-quoted "a question of fact" langauge, directly belies SSC's position. And *Ziebart*, at 226 (which, though affirming this Court's colleague Judge Leighton's decision in a bench trial, had occasion to correct a similar misperception on his part) has again made that crystal clear:

> We believe that whether there is, or is not, likelihood of confusion is a finding of fact to be reviewed under the "clearly erroneous" standard, except that this court can determine just as well as the trial court the factor of similarity of the marks themselves.

■ At the outset that poses a problem for SSC's motion: Summary judgment is not a vehicle for resolving disputed fact questions (*McGraw-Edison*, 787 F.2d at 1167). But "likelihood" is by definition a prediction, not a slice of history. It is a function of many discrete factors, each of which tends to show confusion is more or less likely to occur. Necessarily no single factor is dispositive in the predictive pro-

cess, and all must be considered in the context of the others (*id.* at 1168).

■ Obviously the "fact" of likelihood of confusion is disputed here. But that dispute need not bar summary judgment if it is not "genuine"—if the underlying factors leave no room for debate as to the ultimate finding that confusion is likely. *McGraw-Edison*, 787 F.2d at 1168 follows a long line of cases in requiring analysis of at least seven factors implicated in determining likelihood of confusion. This opinion will look at each.[9]

### 1. Degree of Similarity Between the Marks

Clearly, the more similar the appearance, sound or presentation of the marks, the more likely it is confusion will follow (*Sterling Drug Inc. v. Lincoln Laboratories, Inc.*, 322 F.2d 968, 971 (7th Cir.1963) (comparing "Diaparene" with "Dyprin"). SSC Mem. 18 quite correctly says the test of similarity is not "side-by-side comparison." *James Burrough*, 540 F.2d at 275 teaches:

> It is of course proper to consider similarities and dissimilarities between the marks in their entireties as one element in determining likelihood of confusion. But the comparison is not that involved in testing for copyright infringement. Though the marks must be compared, they must be compared in the light of what occurs in the marketplace, not in the courtroom.
>
> Hence it was judicial error below to have evaluated [plaintiff's] evidence on the basis of a judicial comparison of [plaintiff's] label and [defendant's] sign. Side-by-side comparison is not the test. *Sterling Drug, Inc. v. Lincoln Laboratories, Inc.*, 322 F.2d 968 (CA7 1963).

---

9. This opinion was completed immediately before the September 10 *Ziebart* slip opinion was delivered to this Court. *Ziebart*, at 226 articulates the "generally considered seven factors" a bit differently from *McGraw-Edison*:
 1. the distinctiveness (or strength) of the marks in issue;
 2. the similarity of the marks;
 3. the similarity of the products;
 4. the similarity of the channels of distribution;

 5. the identity of the advertising media used;
 6. the intent of the claimed infringer; and
 7. the evidence of actual confusion.

 Because the thrust of those factors is really the same as in the *McGraw-Edison* formulation, and the result here would be identical under the *Ziebart* locution, this opinion has not been rewritten to track with *Ziebart*.

The consuming public is unlikely ever to be presented with the opportunity for such comparison.

\* \* \* \* \* \*

The [defendant's] sign must therefore be evaluated on the basis of its likely effect upon consumers who do *not* have [plaintiff's] label before them, but who may have a general, vague, or even hazy, impression or recollection of [plaintiff's] marks such as may trigger a belief that a relation exists between [plaintiff] and the enterprise identified by the sign.

Despite its lip-service acceptance of that framework, SSC Mem. 18–19 still proceeds simply to lay its marks next to CJ's and pronounce them "similar" because the word "source" is a "dominant" or "salient" feature of all. That ipse dixit approach really begs the question. Of course the marks are similar to some degree. What matters is *how* similar, taken in a marketplace context. Mere identification of a common element really doesn't address that issue. After all, the marks are also dissimilar in potentially significant ways:

1. CJ uses the compound coinage "JobSource," while SSC uses the word "source" alone or as an adjectival noun.

2. None of SSC's marks containing the word "source" also contains words denoting or suggesting jobs or employment.[10]

3. CJ uses a specific typeface and design, while SSC uses a variety of typefaces and designs, none of which (so far as the record shows) is anything like CJ's.

Simply on that basis, the record presented here does not go very far toward answering the question *how* similar the marks are in the relevant ("marketplace") sense. In *Source Services,* 635 F.Supp. at 606 SSC introduced some evidence of actual confusion: testimony by two consumers who said they responded primarily to the "source" element in the parties' marks.[11] Judge Rovner found that testimony too

sketchy to resolve the similarity issue in SSC's favor. Here SSC has not even introduced that much evidence, and the marks at issue are less obviously similar.

Questions of degree are peculiarly jury questions. To meet its burden of showing the absence of material fact issues, a summary-judgment movant must show trial of the fact issue would yield a "foregone conclusion" (*Backes v. Valspar Corp.,* 783 F.2d 77, 78–79 (7th Cir.1986)). But as this opinion has already stated, the issue in likelihood-of-confusion terms is not just similarity vel non, but rather the degree of similarity considered in conjunction with the other six *McGraw-Edison* factors. All that need be said at this point is that SSC's similarity showing is not very strong.

### 2. *Similarity of the Services or Products*

Where plaintiff's and defendant's services or products are dissimilar, the fact they carry similar trademarks may not lead to source confusion. Consumers are prone to pigeonhole producers of goods and services. They tend to assume (for example) a company that makes cars is not likely also to make candy. So a consumer may be unlikely to believe "Ford Chocolate" is a product of the Ford Motor Company, even if the marks have some similarity. Conversely, where products or services are very similar consumers may tend to be confused by not-so-similar marks.

That psychological intuition is highly context-bound. As product lines become increasingly diversified, and as "labels" having sales prestige of their own are affixed to products as diverse as clothes and cigarettes, the significance of product *dissimilarity* may have become attenuated. In trademark-law terms, the issue is "whether the products are the kind the public attributes to a single source" (*McGraw-Edison,* 787 F.2d at 1169). Once again the public, not the judicial, perspective is what counts.

---

10. For example, an untutored consumer might think "Source Finance" was a loan company.

11. In *Source Services* the defendant (Source Telecomputing Corp.), like SSC, used "source" as an independent word.

SSC says the "services" here are closely similar: Both SSC's agencies and CJ's publication are aimed at "finding and filling jobs," in many cases the same kinds of jobs. CJ says it is a publisher while SSC is an employment agency.[12]

■ Again points of similarity and dissimilarity exist. Neither side has submitted any evidence as to trade practices or public perceptions in the employment field. Would the relevant public tend to attribute a weekly newsprint advertising paper to a blue-chip employment agency?[13] This Court is not a surrogate for public opinion, and where that is the test logic alone cannot yield the answer. In *Source Services,* 635 F.Supp. at 608 SSC also introduced some evidence actual customers did not find it surprising defendant would offer plaintiff's services. Once again, SSC has not even gone that far here. Its showing leaves undispelled doubts.

### 3. Area and Manner of Concurrent Use

■ At the risk of sounding like a broken record, this Court notes SSC has said very little about any geographical or marketing overlaps between its marks and CJ's. It stresses the "millions of dollars" it has spent on advertising over the years, but it has said nothing about how those dollars were spent and whether or not they were spent in places or media likely to catch the attention of CJ's "audience." In fact the only actual evidence as to SSC's marketing efforts is the advertising it took out in *The JobSource* itself (see Saunders Aff. Ex. 5, at 3, the February 3, 1986 issue of *The JobSource* with a "Source Finance" display ad). From that ad it is not wholly

unreasonable to infer SSC thought it was reaching out to a new, untapped audience.[14]

It should also be recalled both SSC and CJ have dual "audiences": company personnel directors seeking employees and job seekers seeking employment. Conceivably the level of sophistication displayed by those groups toward marketing differentiation is dissimilar. SSC's uninformative approach does not help to sort that out.

True enough, there is an undisputed trade overlap at least to the extent SSC and CJ do business in the Chicago metropolitan area. Overall, however, SSC has provided less than an adequate record for resolving this factor conclusively in its favor.

### 4. Degree of Care Likely To Be Exercised by Consumers

SSC has not really addressed this element in terms. As this opinion has already stated, some of the "consumers" of both parties' wares are personnel directors, who might be expected to exercise considerable care before committing any substantial amount of company funds (see *Maxim's Ltd. v. Badonsky,* 772 F.2d 388, 393 (7th Cir.1985) (higher product cost justifies assumption consumers will exercise greater care in purchasing)). Other "consumers" are the job seekers responding to the ads, for whom carelessness may pose little downside risk.

■ Even were this Court free to indulge such speculations on a full record, the present evidence says nothing about the relative importance or size of the two "audiences" within each of SSC and CJ and as between the two firms. SSC gains no ground here.

---

**12.** In the technical sense, CJ labels its own use a trademark (because it sells only a product to which the mark is affixed) as contrasted with SSC's servicemark usage, while SSC urges both parties are selling services and therefore employ servicemarks. Though the adoption of SSC's characterization is not necessary to a finding of infringement, the fact of competition in the same market (as by selling like services) plainly enhances the likelihood of confusion. Hence SSC tries to get a leg up by promoting its perspective of CJ's usage.

**13.** As this Court must draw the pro-CJ inferences for summary-judgment purposes, that question is obviously framed in a pro-CJ way (see n. 12).

**14.** That of course is not a controlling factor, for a mark's owner may also obtain protection against infringement in a logical field for expansion of its current use (wholly apart from the concept of dilution). All the same, it is still another point against summary disposition.

### 5. *Strength of Plaintiff's Mark*

■ "Strong" marks are magnets, drawing consumers' attention away from the characteristics of a product or service and toward its producer or provider. "Weak" marks have no better than a blurred effect in that respect, in at least two ways:

1. Where a mark tends to describe the characteristics of a product or service, consumers may not be sure the mark *is* a mark. For example, the slogan "Buy Sweet Chocolate" tends only faintly (if at all) to suggest the chocolate is manufactured by the Sweet Company.

2. Where numerous producers or providers use similar marks for similar products or services, consumers may not be at all sure whose mark they are dealing with (though what lawyers term trademark or servicemark usage may be involved). Perhaps paradoxically, that sort of real confusion militates against finding a "likelihood of confusion" in the Lanham Act infringement sense. If consumers are generally confused as to the origin of a product or service, there is no particular likelihood defendant will be in a position to capitalize on plaintiff's mark. Put differently, if consumers don't have a clear sense of what plaintiff's mark represents, they are unlikely to purchase defendant's product or service thinking it is plaintiff's.

Courts have developed a shorthand for assessing a mark's strength, classifying marks (in increasing-strength order) as "descriptive or generic," "suggestive," "arbitrary" or "coined" (*McGraw-Edison*, 787 F.2d at 1170–71). SSC does not claim its use of "source" is either coined or arbitrary. Its Mem. 24 says its mark is not generic because the term is not synonymous with "career guidance firms" or "placement services." But that flies in the face of SSC's argument as to why its business and CJ's are similar: Both are "sources" of employees to employers and of job opportunities to job seekers. In that sense any producer or supplier is a "source" of what it produces or supplies.

SSC also says (at least in the employment field) when people think "source" they think of SSC—and a word weak in one context may be strong in another (*A.J. Canfield Co. v. Vess Beverages, Inc.*, 612 F.Supp. 1081, 1090 (N.D.Ill.1985), *aff'd*, 796 F.2d 903 (7th Cir.1986)). But that is so primarily where a term descriptive as to one product is not descriptive as to another, becoming in effect arbitrary (or at a minimum suggestive). "Sweet Cars" might be a strong mark where "Sweet Chocolate" might not.

On that issue SSC says it is the only employment-related business (besides CJ) currently using the word "source" in its mark.[15] But "source" as applied to a service or product provider does not describe the type of service or product provided. Rather, it describes the fact of providing it. Such a mark is no more fanciful as applied to employment services than as applied (say) to investment management services. SSC may have staked out a business category for itself. But unless that business category bears a different relationship to the descriptor in its mark than do other business categories (as in the case of "sweet" cars and "sweet" chocolate—or, to use SSC R. Mem. 21–22's own example, "mustang" cars and "mustang" horses), the "context" argument discussed in *A.J. Canfield* can offer no basis for strengthening a mark.

CJ says there are at least 15 corporations registered to do business in Illinois that use the word "source" in their names (Saun-

---

**15.** At least as recently as February 26, 1986 a company called "The Source For Temporaries, Inc." was advertising in *The JobSource* (see Saunders Dep. Ex. 7, at 6). SSC President Gary Weiss ("Weiss") Suppl. Aff. ¶ 4 says SSC has reached a settlement with that company, and its use of "source" in its name will cease. Weiss (*id.*) also says in the past ten years SSC has filed lawsuits against "at least ten companies" that had attempted to use "source" as a mark in employment-related businesses. Each of those suits has resulted in a settlement or consent judgment under which the defendant's use of "source" has ceased. While that says a great deal about SSC's aggressive servicemark protection policy, it also says a lot of companies have had the idea of using "source" in their names—hardly a surprising proposition.

ders Aff. ¶ 12 and Ex. 7). SSC correctly responds that fact simpliciter doesn't prove anything about the nature and extent of "source" mark usage by those corporations. But SSC's claim that consumers' perception of "source's" source does not bleed over from employment to other categories is equally without evidentiary support.[16] Nor is SSC's claim it has spent millions of dollars advertising and defending its marks probative when a general marketplace context must be considered.[17] What counts is the impact of that advertising on consumers (a matter as to which the record is totally devoid of evidence), not its cost to SSC.

Apparently recognizing the weakness of that position, SSC Mem. 16–17 leaned heavily on the argument three of its "source" marks have become incontestable under Section 1065 and are thus "conclusively presumed to be strong, since they are presumed to have acquired secondary meaning." SSC's reply memorandum has abandoned that argument, however, as well it should have done.

■ It is true an incontestable mark cannot be invalidated in an infringement suit on the ground it is merely descriptive (*Park 'N Fly*, 105 S.Ct. at 667). But as SSC initially observed, there are two elements to an infringement suit: (1) validity of the mark and (2) likelihood of confusion. CJ does not argue SSC's incontestable marks are invalid.[18] However, validity and likelihood of confusion are distinct issues (as *Union Carbide Corp. v. Ever-Ready*

*Inc.*, 531 F.2d 366 (7th Cir.), *cert. denied*, 429 U.S. 830, 97 S.Ct. 91, 50 L.Ed.2d 94 (1976) makes plain), and an incontestability finding in no way concludes the confusion question. *Union Carbide*, 531 F.2d at 377 (in an analysis explicitly approved in *Park 'N Fly*, 105 S.Ct. at 667) held plaintiff's mark ("Eveready") could not be attacked—for validity purposes—as merely descriptive once it had achieved Section 1065 incontestability status. But *Union Carbide*'s likelihood-of-confusion analysis (531 F.2d at 381–88) never mentioned incontestability even once as a factor to be considered. Instead the court said (531 F.2d at 377):

Incontestability does not broaden a trademark in the sense that it allows a registrant to claim rights over a greater range of products than he would otherwise be entitled to claim; but once incontestability is established, registrant's mark is immune from challenge on any grounds not enumerated in § 1115(b).

■ Validity is a matter of the mark's ability to stand *as* a mark. If it is merely descriptive of its product, it will not be readily recognizable as any producer's signature. But likelihood of confusion is a matter of comparing one mark's recognition factor with that of another. As Judge Rovner held in *Source Services*, 635 F.Supp. at 610, that issue depends on the actual marketplace facts and cannot be resolved by resting on incontestability. Both *Union Carbide* and *Park 'N Fly* teach the conclusive presumption of secondary mean-

---

16. Weiss Aff. ¶ 4 says he is "aware" SSC's clients "often" refer to it "simply as SOURCE." Needless to say, Weiss' rather vague "awareness" is not at issue here. Even apart from its inadmissibility under Rule 56(e), his "evidence" is simply not probative as to the actual character and extent of customer perceptions.

17. In *Dictaphone Corp. v. Dictamatic Corp.*, 199 U.S.P.Q. (BNA) 437, 440–41 (D.Ore.1978) Dictaphone's advertising program was held "greatly" to have strengthened its mark. But there the record revealed a detailed account of Dictaphone's advertising means and methods, so that the court could justifiably call Dictaphone's advertising "extensive." Here SSC has chosen to rest on the assertion it has spent "millions of

dollars" on advertising, without offering any documentation as to time, place, means or methods. That conclusory and uninformative approach, evident all through SSC's argument, offers this Court no factual predicate solid enough to ground a conclusion as to the strength of SSC's marks.

18. Nor does CJ say SSC's other marks are invalid, apparently preferring to rest exclusively on the second-step likelihood-of-confusion issue. With SSC having three incontestable "source" marks, any CJ argument that the others were invalid would still force it to face the likelihood-of-confusion issue as to the incontestable three (but see nn. 7, 10).

ing merely means an alleged infringer is not permitted to raise descriptiveness as a defense against the validity of plaintiff's mark. That says nothing about the expected reactions of actual marketplace consumers. Defendants are foreclosed from attacking the validity of an incontestable mark, but plaintiffs must still provide a *factual* predicate showing consumers are likely to confuse defendants' products with their own. And the more descriptive a mark is in fact, the less likely that sort of confusion will be.

Neither the unfocused factual record here nor SSC's spurious incontestability argument shows strength. SSC gains nothing at this step.

### 6. *Actual Confusion*

SSC admits there is no evidence of actual confusion here. True enough, evidence of actual confusion is not necessary to show a likelihood of confusion (*Union Carbide*, 531 F.2d at 383), but where present it is a powerful argument tending to show a likelihood exists. SSC Mem. 20 does attempt to turn the absence of actual confusion evidence to its advantage by blaming CJ for failing to set up a mechanism to monitor confusion. Of course that is irrelevant.[19]

### 7. *Intent on the Part of the Alleged Infringer*

Infringement is not a criminal-law concept, and proof of wrongful intent is not necessary. Nevertheless here as elsewhere the law assumes one who intends a result is likely to take steps to achieve it (*Tisch Hotels, Inc. v. Americana Inn, Inc.*, 350 F.2d 609, 613 (7th Cir.1965)).

SSC Mem. 22 urges "substantial evidence" of CJ's "wrongful intent":

1. CJ went ahead with its "Job-Source" mark though it had "constructive knowledge" of SSC's marks based on their federal registrations.

2. CJ continued to use its mark after receiving cease-and-desist notices from SSC's lawyers.

Neither approach removes intent as a disputed fact issue.

First, even assuming CJ is to be charged with "constructive knowledge" of SSC's marks, that could give rise to nothing more than "constructive intent"[20] on its part. That notion cannot perform the function of actual intent to bring about a desired confusion. In any case CJ did turn to a research firm for advice as to prior registrations of similar marks. That firm turned up none of SSC's marks. CJ's actual intent at the outset is thus squarely at issue.

Second, the fact CJ continued to use its "JobSource" mark after receiving SSC's lawyers' letter shows wrongful intent only if CJ acknowledged SSC's infringement claim as valid. But if (as is the case here) CJ disputes SSC's infringement claim, then the fact CJ ignored SSC's letter surely does not make out a watertight intent showing. Perhaps a jury would not believe CJ's statement on that score, but such credibility determinations cannot be made at the summary-judgment stage (*McGraw-Edison*, 787 F.2d at 1173).

\* \* \* \* \* \*

In sum, SSC has not established the lack of genuine issues of material fact as to any of the seven *McGraw-Edison* factors. Necessarily its summary-judgment motion addressed to Counts I, II and III, and to

---

**19.** SSC Mem. 21 also says CJ failed in its duty to select a mark sufficiently distinctive to avoid "all possible confusion" with SSC's marks, citing *Northam Warren Corp. v. Universal Cosmetic Co.*, 18 F.2d 774, 775 (7th Cir.1927):

One entering a field of endeavor already occupied by another should, in the selection of a trade-name or trade-mark, keep far enough away to avoid all possible confusion.

But that precatory dictum overstates both (1) the standard actually applied in that pre-Lan-

ham Act case and (2) the current test under Sections 1114(1)(a) and 1125(a): "likelihood of confusion," not avoidance of "all possible confusion."

**20.** "Constructive" is a sure tipoff that we are dealing with a legal fiction. "Constructive" intent is not real intent any more than "constructive" notice is real notice (just as "quasi-contract" is a fiction denoting the nonexistence of a real contract).

the Illinois Deceptive Trade Practices Act aspect of Count IV, must fail.

### Antidilution Act Claim

 *McGraw-Edison,* 787 F.2d at 1174 said:

> Under the Anti-Dilution Act, the relevant factors to be considered by the court are "the distinctiveness of the mark and whether the mark is being diluted." *Hyatt Corporation v. Hyatt Legal Services,* 736 F.2d 1153, 1157, *cert. denied,* 469 U.S. 1019, 105 S.Ct. 434, 83 L.Ed.2d 361 (1984).

SSC Mem. 14 n. 4 states the *Hyatt* test, but nowhere does SSC show an absence of material fact issues as to dilution. This opinion has already established the existence of a fact question as to the strength of SSC's marks, and that analysis is also applicable to the distinctiveness issue (*McGraw-Edison,* 787 F.2d at 1174). Necessarily, then, there is no predicate for summary judgment as to Count V.

### Consumer Fraud Act

Neither of SSC's memoranda even mentions the Consumer Fraud Act. Indeed, SSC Mem. 13 enumerates SSC's claims and omits the Consumer Fraud Act from its list, while urging likelihood of confusion is "The Test For Liability For All Claims Asserted By Plaintiff." That certainly appears to be an abandonment of the Consumer Fraud Act claim, but in any case there is no need to determine whether or not the proper test for that claim is likelihood of confusion. Of course if it were, summary judgment must be denied.

### Conclusion

Genuine issues of material fact abound here. They exist as to all Counts of the Complaint, and SSC's summary judgment motion is therefore denied. This case is set for a status report at 9 a.m. October 2, 1986, at which time:

1. SSC is ordered to inform this Court whether or not it has indeed abandoned its Consumer Fraud Act claim.

2. Both sides will be expected to address a trial-preparation schedule.