**OHIO ART COMPANY, Plaintiff,**

v.

**LEWIS GALOOB TOYS, INC., et al., Defendants.**

**No. 92 C 947.**

United States District Court, N.D. Illinois, E.D.

July 20, 1992.

---

Robert J. Schneider, Michelele C. Burke, Margaret Duncan, Paula J. Krasny, Anne R. Pramaggiore, McDermott, Will & Emery, Chicago, Ill., for plaintiff.

Martin R. Glick, M. Patricia Thayer, Deborah A. Kemp, Howard, Rice, Nemerovski, Canady, Robertson & Falk, San Francisco, Cal., Walter C. Greenough, Schiff, Harden & Waite, Chicago, Ill., for defendants.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

SHADUR, Senior District Judge.

Ohio Art Company ("Ohio Art") has sued three defendants—Lewis Galoob Toys, Inc. ("Galoob"), GALCO International Toys, N.V. ("GALCO") and Vaughn Associates, Inc. ("Vaughn")—in a multi-count Complaint charging defendants with violations of Ohio Art's intellectual property rights. This Court has conducted an evidentiary hearing occupying several trial days (the "Hearing") to consider Ohio Art's motion for preliminary injunctive relief. In accordance with Fed.R.Civ.P. ("Rule") 65 and the requirements of Rule 52(a), what are set forth here are the findings of fact ("Findings") and conclusions of law ("Conclusions") that constitute the grounds of this Court's action on that motion.

To the extent (if any) that the Findings as stated may be deemed conclusions of law, they shall also be considered Conclusions. In the same way, to the extent (if any) that matters later expressed as Conclusions may be deemed findings of fact, they shall also be considered Findings. In

both those respects, see *Miller v. Fenton*, 474 U.S. 104, 113–14, 106 S.Ct. 445, 451–52, 88 L.Ed.2d 405 (1985).

### Findings of Fact

#### Parties

1. Ohio Art is a corporation organized and existing under the laws of Ohio with its principal place of business at 1 Toy Street, Bryan, Ohio 43506. Ohio Art is in the business of manufacturing and marketing toys and games, including the Etch A Sketch drawing toy.[1]

2. Galoob is a corporation organized and existing under the laws of California with its principal place of business at 500 Forbes Boulevard, South San Francisco, California 94080. Galoob is also in the business of manufacturing and marketing toys and games, including the Pocket Play Doodle It drawing toy.

3. GALCO is a corporation organized and existing under the laws of the Netherlands Antilles with its principal place of business at 701–8 South Tower World Finance Center, Harbour City, Tsimshatsui, Kowloon, Hong Kong 201. GALCO is a subsidiary of Galoob.

4. Vaughn is a corporation organized and existing under the laws of Illinois with its principal place of business at 1011 East Touhy Avenue, Suite 235, Des Plaines, Illinois 60018.

#### Pending Claims and Motions

5. On February 6, 1992 Ohio Art filed a five-count Complaint alleging trademark, service mark and collective membership mark infringement under 15 U.S.C. § 1114[2] (Count I); false designation of origin under Lanham Act § 43(a), Section 1125(a) (Count II); violations of the Illinois Consumer Fraud and Deceptive Business Practices Act and Deceptive Trade Practices Act (Count III); violation of the Illinois Trademark Act (Count IV); and common law unfair competition and infringement of common law trademarks and trade dress (Count V).

6. All defendants have denied the substantive allegations of the Complaint and have asserted seven affirmative defenses: inexcusable delay in bringing suit; functionality of Ohio Art's mark; descriptiveness of Ohio Art's mark and lack of secondary meaning; estoppel; material misrepresentations to the Patent and Trademark Office ("PTO") by Ohio Art in procuring the registration of the mark at issue; inequitable conduct before the PTO by Ohio Art; and attempted unlawful extension of patent protection. All defendants also filed a counterclaim against Ohio Art for trademark misuse under Section 1120 (First Claim for Relief) and for cancellation of Ohio Art's Trademark No. 1,587,707 (the "Mark") under Section 1119 (Second Claim for Relief).

7. Simultaneously with its filing of the Complaint, Ohio Art filed a motion for preliminary injunction to enjoin defendants from marketing Doodle It. Shortly thereafter defendants filed a motion for summary judgment on all of Ohio Art's claims. Following extensive briefing and the submission of affidavits by the parties on both motions, this Court held the four-day evidentiary Hearing referred to earlier. Both sides have since submitted post-Hearing proposed Findings and Conclusions.

#### Products in Issue and Their Trade Dress

8. Since 1960 Ohio Art has marketed Etch A Sketch in basically the same configuration: a rectangular (7″ × 5″) grey opaque drawing screen encased in a nearly rectangular (9¾″ × 8″ × 1″) plastic frame with two round knobs protruding from the plastic, located at the lower corners of the frame outside of the drawing screen but inside the outer borders of the frame.

---

1. Although Etch A Sketch and the other toys referred to in these Findings are marketed using a variety of type faces for their respective names, in the interest of uniformity these Findings will employ capital and lower case letters for all such product names. No inference should of course be drawn for trade dress or trademark purposes from any apparent similarities that may be created by such uniform usage, for the names themselves actually present quite different appearances (some in script, some all in capitals, some all in lower case letters, etc.).

2. Further citations to provisions of Title 15 will simply take the form "Section—."

9. Since at least 1973 Etch A Sketch has been and is currently sold almost exclusively in its "traditional red" color with white knobs (there is a more expensive gold model sold in certain upscale stores). Imprinted on the product are the Ohio Art logo, the product name (Magic Etch A Sketch) and the slogan "Making Creativity Fun®." Ohio Art's logo featured on the product is a plain unadorned rectangle containing a world globe encircled with a band labeled "Ohio Art."

10. Etch A Sketch is sold in a pyramid-shaped box covered with shrink wrap plastic that displays the entire front of the toy itself through the clear-plastic-covered open front of the box. As for the sides of the box, they are in the traditional red Etch A Sketch color marked with yellow horizontal lines. Also on the sides of the box are the Ohio Art logo, the Etch A Sketch product name and photographs depicting the toy. In this instance the Ohio Art logo is a red square with a white border and the words "Ohio Art The World of Toys" imprinted in yellow. As for the back of the box, it is bright yellow with a border of the traditional red Etch A Sketch color marked with yellow horizontal lines. It displays the Etch A Sketch product name, a large photograph depicting the toy and two Ohio Art logos. One of the logos is like that appearing on the toy itself (see Finding 9), while the other is like that appearing on the sides of the box and described in this Finding. Neither logo includes the Mark's simple configuration of a rectangle within a rectangle with two small circles at the lower corners between the rectangles (see Finding 18 and Finding 29 n. 7).

11. In mid–1990 independent inventors presented Galoob with a new idea for a product called Lite Mite—a portable, low cost activity toy. Impressed with the idea and with its sales force's reaction to the toy, Galoob decided to develop a full line of similar easy-to-carry toys. At its request an outside design firm created a style setting the tone for what would become its Pocket Play line. Doodle It and Line Shines were the next two products intro-

duced into the line, each having a design consistent with that developed for the other products in the Pocket Play line. As a result of the success of the first three products, in 1992 Galoob added Power Doodle It and Mini Doodle It to its line of portable products.

12. At the time that Doodle It was being developed, Galoob was aware that the Grandjean patent on Etch A Sketch had expired and that the Clark patent was about to expire.[3] It did not know of Ohio Art's configuration trademark registration of the Mark, however, until it received a letter from Ohio Art in February 1991. Notice of that Mark did not appear on Ohio Art's packaging until some time in 1991.

13. Galoob began marketing Doodle It in late 1990. Doodle It has a squarish frame (measuring $5.3'' \times 5.5''$) with rounded corners and a nearly square drawing screen measuring $3.75'' \times 3.3''$. Its control knobs extend outward from the frame at its lower corners, where they are nearly flush with the upper surface of the frame.

14. Doodle It is marketed in bold eye-catching colors: neon orange with bright blue knobs; hot pink with neon lime green knobs; bright blue with neon orange knobs; and neon lime green with hot pink knobs. Doodle It is packaged in a b⁻ ter pack, with the toy being mounted on cardboard approximately double the size of the toy itself. Its packaging is consistent with the packaging of the other Pocket Play line products, which are color-coded by price (bright blue, pink and orange). Doodle It's cardboard mounting has a front in bright blue with a narrow border of alternating neon orange and bright blue, and it prominently displays Galoob's name and logo, the product line name, the product name and a photograph depicting the toy in operation. As for the back of the cardboard mounting, it is white in color and also displays the Galoob name and logo, the product line name and the product name. Also featured there are graphics illustrating how to operate Doodle It and depicting two other Pocket Play products, Mini Lites and

---

**3.** See Finding 17 as to those patents.

Line Shines. Designed to be hung from a rack, the cardboard mounting has a "J hook" at the top. Doodle It's knobs are exposed and can be manipulated without breaking the blister package, which is labeled "Try Me." Doodle It is typically sold at about half the price of Etch A Sketch.

15. Doodle It and Etch A Sketch use the same basic action mechanism. Each toy's interior apparatus comprises four pulleys and two cords connected to a pair of crossed rods, set perpendicularly to one another, which move a stylus in vertical and horizontal directions across a screen dusted with a fine powder. That movement of the stylus across the screen creates dark line drawings.

16. Some 32 years after Ohio Art first began marketing Etch A Sketch and more than a year after Galoob began selling Doodle It and had achieved sales of 600,000 units in the United States, Ohio Art introduced a new product—Travel Etch A Sketch—at the New York Toy Fair in February 1992. Travel Etch A Sketch is much smaller than Etch A Sketch and is substantially less rectangular in appearance because of the combined effect of the greater rounding of its corners and its much smaller dimensions. Travel Etch A Sketch's outer casing measures 6¼" × 5⅜", and its screen measures 4½" × 3¼". In further contrast to Etch A Sketch, the knobs of Travel Etch A Sketch have been shifted outward and downward. That newer toy was not available for consumers to purchase at retail stores until late March or early April 1992.

*Registration of the Mark*

17. For many years Etch A Sketch enjoyed the protection of two United States patents: the Grandjean patent (No. 3,055,-113), which issued on September 25, 1962 and expired on September 25, 1979, and the Clark patent (No. 3,760,505), which issued on September 25, 1973 and expired on September 25, 1990. Those patents described and depicted the apparatus utilized in Etch A Sketch.

18. On December 11, 1987 Ohio Art applied to the PTO to register the Mark: a trademark consisting of a line drawing showing the bare outlines of the Etch A Sketch configuration, comprising two unadorned rectangles, with two circles in the lower corners of the outer rectangle.

19. Twice the PTO refused to register the Mark, first stating that it "consists of a common geometrical shape [without] any trademark significance," and later saying that "the square screen and round dials appear to be the easiest and best design for this type of sketching toy." Accordingly the PTO directed Ohio Art to "indicate whether the proposed mark is the subject of either a design or utility patent" and, if so, said that Ohio Art should provide all information concerning the patent. In addition the PTO asked Ohio Art to state "whether alternative designs are available for the feature embodied in the proposed mark" and, if so, "whether the alternative designs are equally efficient and whether alternatives are more costly to produce."

20. In response to the PTO's second refusal to register, on January 29, 1989 Ohio Art submitted a brief entitled "Response to Office Action" accompanied by exhibits. Ohio Art there made repeated representations to the PTO as to the scope of its claimed mark. It urged that the configuration it was seeking to register— the same one that had been depicted as the "preferred embodiment" in the Grandjean patent—was nonfunctional, by contrasting that configuration with other alternatives that would also utilize the same mechanism disclosed by the Grandjean patent:

The outer perimeter could be square, round, oblong, scalloped, square, have side or top handles, or a number of other shapes without detracting from the invention disclosed in the Grandjean Patent. The stylus controls could bear different proportions to the frame's shape, could be executed in the form of cross-shaped, T-shaped or star-shaped knobs, or could be placed at the different locations on the toy's surface. For example, the knobs could, with a gear change, be located on the lateral sides, to achieve a completely flat top surface. The inner screen border could also be executed in a number of different shapes, and in dif-

ferent positions or proportions in relation to the outer rectangle and the stylus controls.

21. In support of its contention that Etch A Sketch's function could be performed just as easily and economically by toys that used different shapes, Ohio Art cited five existing toys, two of which had round drawing screens while the others were square or rectangular.[4] Ohio Art represented to the PTO that those toys "perform[ed] basically the same function" as Ohio Art's toy yet "have surface configurations different from the one claimed by Applicant as a trademark." In emphasizing that "Other alternative designs are available," Ohio Art went on to say (emphasis added):

It is significant that a toy with a *square (instead of rectangular) screen design* operates just like Applicant's toy and is available in the marketplace.

And in identifying the "alternative designs" that purportedly showed the nonfunctional nature of its own configuration, it expressly pointed to the fact that the competing Electra Doodle toy had a "square, rather than rectangular TV-shaped screen."

22. In reliance upon Ohio Art's representations as to the exclusivity of its use of the claimed shape, the lack of functionality of that shape and the availability of alternative designs, on March 20, 1990 the PTO registered the Mark as No. 1,587,707.

*Communications Between the Parties*

23. On February 14, 1991 counsel for Ohio Art sent a letter to Galoob by facsimile transmission, charging that the Doodle It configuration infringed the Mark.

24. Galoob promptly forwarded the letter to its counsel for consideration. On February 26, 1991 its counsel responded to Ohio Art by facsimile letter, explaining that (a) the shape of Doodle It is distinctive and radically different from that of Etch A Sketch, (b) the price points of the two products are far apart, (c) the trademarks on the two products have no similarity and (d) the Etch A Sketch patents had expired.

25. During the following month counsel for Ohio Art and Galoob exchanged more facsimile communications and phone conversations. In addition, Ohio Art was provided with a sample of the Doodle It product. After Galoob's last letter dated March 25, 1991 there was no further oral or written communication from Ohio Art for nearly seven months. It was not until October 14, 1991 that Galoob's counsel next received a letter from Ohio Art's counsel, purporting to respond to the arguments raised by Galoob in February and March 1991. Galoob's counsel replied on November 19, 1991, asking Ohio Art to provide answers to the questions previously raised as to the Mark's file history and stating that the long period of silence had prejudiced Galoob. Ohio Art did not respond to that letter, instead filing this action three months later.

*Secondary Meaning: the Mark*

26. There is a presumption of secondary meaning in the Etch A Sketch configuration as a result of the PTO's registration of the Mark on the Principal Register. That presumption has been rebutted, however, by evidence presented to this Court though not previously submitted by Ohio Art's lawyers to the PTO. Thus Ohio Art is not at all likely to prevail on the issue of secondary meaning at trial.

27. Any analysis of secondary meaning must start with the fact that the Mark consists of three simple geometric figures having a plain and common configuration. Ohio Art's Mark did not embellish the basic shape of the toy as depicted in the Grandjean and Clark patent drawings. As the PTO recognized, such a shape is not inherently "distinctive" in the trademark sense and is not protectible absent a showing of secondary meaning.

---

**4.** Those five products were: Skeedoodle by Hasbro, which has a round domed screen and is operated by a single joystick; Tap N' Doodle, which is round and has a stylus that is moved by striking the side of the toy; Electra Doodle by Mego, which has a square screen and two levers and is operated by two electric motors; Easy Sketch by Ideal, which is rectangular and is operated by a joystick and electric motor combination; and Mini Telecran, which has a rectangular screen and two round knobs located midway on the sides.

28. As Finding 26 indicates, the PTO was not given the opportunity to consider all of the evidence of secondary meaning (or of the lack of such meaning) that has been presented to this Court:

(a) For example, the PTO assumed that Ohio Art had exclusively used the Mark for nearly 30 years.[5] But at least three other toys that used the same mechanism and that were nearly identical in shape and size to Etch A Sketch were marketed before the registration of the Mark. Easy Writer I and Easy Writer II have been marketed since at least 1988. Better Sketch was introduced in late 1989 and was sold until the latter part of 1991.[6] In addition, Pocket Artist is available in this country and also uses the rectangle within a rectangle configuration, albeit with different knob shape and placement.

(b) In addition, the PTO did not have the opportunity to review the same advertising evidence that has been presented to this Court. Moreover, because registration is an ex parte proceeding, the PTO did not have the benefit of cross-examination of that evidence. All of that evidence discloses that Ohio Art's extensive advertising of its toy has always prominently featured its word trademarks "Etch A Sketch" and "Ohio Art" and has almost invariably featured Etch A Sketch's traditional red color.

29. Nor has any of Ohio Art's Etch A Sketch advertising ever used any of the familiar methods of drawing consumers' attention to the product's configuration—such things as "Look for the Union Label" [AFL–CIO], "Get a Piece of the Rock" [Prudential] or "You Can Trust Your Car to the Man Who Wears the Star" [Texaco]. Ohio Art never publicly claimed any trademark right in the shape of its product until some time in 1991—*after* the development of Doodle It by Galoob in mid–1990 and long after Easy Writer and Better Sketch had been introduced on the market.[7]

30. It was not surprising, then, that Ohio Art presented no evidence whatever during the Hearing that its advertising has been effective in teaching consumers that the product's *shape*—as contrasted with the *name* Etch A Sketch—signifies a single producer. Ohio Art presented no secondary meaning survey, despite the fact that the Mark has been the subject of litigation for nearly two years. No consumer has ever returned any of the 600,000 Doodle It products to Ohio Art or its distributors, nor has any consumer returned any of the other rectangular drawing toys (Easy Writer, Easy Writer II, Better Sketch or Pocket Artist) to Ohio Art for repair or refund.

31. Ohio Art's evidence of third-party uses of the claimed Mark, including ads and cartoons, also does not establish that the *shape* of the Etch A Sketch product has

---

**5.** That assumption would have been based on two affidavits from Ohio Art's Chief Financial Officer William Martens, who represented to the PTO that "the design mark has become distinctive ... by reason of substantially exclusive and continuous use thereof as a trademark by Applicant ..." and that "no other person, firm, corporation or association [had] the right to use the mark in commerce...."

**6.** Even when Ohio Art negotiated a consent decree against the manufacturer of that product in

late 1991, it permitted many additional Better Sketch toys to be sold by a retailer in Ohio.

**7.** Ohio Art did not include, as it could have, a notice along the following lines on its packaging, product or ads at any time after it began marketing Etch A Sketch in 1960:

The configuration of this product is a trademark of the Ohio Art Company.

By contrast, for some time before the phrase "Etch A Sketch" was registered, Ohio Art used

the "TM" symbol beside that name. Moreover, after the Mark was registered in March 1990

come to signify a single source to consumers. All but one of the submitted exhibits prominently shares the Etch A Sketch name.

32. Essentially Ohio Art has sought to substitute legal arguments as to the claimed secondary meaning of the Mark for the required evidence on that score. But those arguments are just as wanting as its evidence:

(a) Ohio Art contends that secondary meaning is shown by the fact that its product has always appeared in its print and television advertising. But that is really irrelevant—the situation is no different from that of hundreds of well-known products whose advertising has regularly depicted those products but whose *shape* has not acquired any secondary meaning as a result.

(b) Ohio Art also contends that its purported incorporation of the Etch A Sketch shape in its own logo is evidence of secondary meaning. But the Mark as such does *not* appear in either of the company logos: One logo is just a single rectangle—also lacking any circles as the symbolic suggestions of knobs—that contains a world globe encircled with a band labeled "Ohio Art," while the other logo is a red square with a white border and the words "Ohio Art The World of Toys" in yellow. Neither of those logos includes the Mark configuration of a rectangle within a rectangle with two round circles.

Galoob urges that such evidence actually shows that the Etch A Sketch *name* may have become generic.[8] This Court need not address that contention—here the relevant finding adverse to Ohio Art is that no secondary meaning has attached to the Mark.

33. In sum, the strong likelihood demonstrated by the Hearing evidence is that the Ohio Art configuration for its Etch A Sketch—the Mark—is really descriptive of an entire range of drawing toy products. No secondary meaning in that shape is likely to be established at trial.

*Secondary Meaning: Trade Dress*

34. Unlike the situation created by registration of the Mark, there is no presumption of secondary meaning in the trade dress for Etch A Sketch. Rather Ohio Art has the burden of demonstrating such secondary meaning by a preponderance of the evidence. For the reasons stated in both earlier and later Findings, this Court finds no likelihood that Ohio Art will sustain that burden at trial—at least to the extent that Ohio Art's trade dress could even arguably impact on the manner in which Galoob presents its own product to the public (that is, *its* trade dress).

35. Ohio Art offered no evidence of secondary meaning in the overall trade dress of Etch A Sketch at the Hearing. All of its evidence as to sales and advertising sought to focus on the Etch A Sketch product configuration. Again no survey was performed as to the impact of that aspect of Ohio Art's trade dress on consumers.

36. Many elements of the Etch A Sketch trade dress are plain and quite common, including the color of the toy and the clear packaging. Ohio Art did not even establish exclusive use of the overall color scheme used in its packaging. Moreover, no short period of exclusive use, even if it had been demonstrated, would of itself establish secondary meaning.[9]

---

Ohio Art could readily have included notice of the Mark on its product and packaging—but it did not.

**8.** In that respect *Inwood Labs., Inc. v. Ives Labs., Inc.,* 456 U.S. 844, 851 n. 11, 102 S.Ct. 2182, 2187 n. 11, 72 L.Ed.2d 606 (1982), citing *Kellogg Co. v. National Biscuit Co.,* 305 U.S. 111, 118, 59 S.Ct. 109, 113, 83 L.Ed. 73 (1938), teaches:

To establish secondary meaning, a manufacturer must show that, in the minds of the public, the primary significance of a product feature or term is to identify the source of the product rather than the product itself.

**9.** Ohio Art's only evidence on the subject came from its Chairman of the Board William Killgallon, who testified that the trade dress had been changed "sometime in the 1980's" to include the particular color combinations and labels that now appear on the packaging. Thus the trade dress now in use is of fairly recent vintage. It should of course be added that nothing in the recent decision in *Two Pesos, Inc. v. Taco Cabana, Inc.,* —— U.S. ——, 112 S.Ct. 2753, 120 L.Ed.2d 615 (1992) impacts on this case, particularly given the sharp differences between the trade dresses of the parties' products here (see Findings 8–10, 13–14 and 44).

37. In sum, Ohio Art has not met its burden of establishing secondary meaning in the trade dress of Etch A Sketch. And even were the proof more persuasive in that respect, it would not call for a different result here in light of Doodle It's sharply different trade dress.

*Likelihood of Confusion: the Mark*

38. Doodle It has a decidedly (and meaningfully) different shape from that depicted in the Mark's registration: It is smaller, nearly square (not rectangular), has much more rounded (not sharp) edges, locates the knobs outside (not inside) the frame and has enlarged knobs. Those very significant differences aggregate to create a highly different overall appearance—so much so as to make it extremely unlikely that consumers will be confused as to the source of the products. Moreover, even if the Mark were to be held valid, neither Galoob nor any other defendant has made any use of it, or even a colorable imitation of it, in designing and marketing Doodle It. Although that might obviate any need to reach the likelihood-of-confusion issue at all, in the interest of completeness the following Findings deal with that subject.

39. Ohio Art introduced no survey evidence on the issue of likelihood of confusion. On the other side of the coin, Ohio Art did introduce a business record that revealed how it keeps close track of individual product returns and customer requests for reimbursements. Significantly those records did not reflect that any customers were confused by the presence of the rectangular Better Sketch or the Easy Writer I and II products on the market. It is even less likely that consumers will be confused by the very differently shaped Doodle It product.

40. There is no evidence of *actual* confusion between Doodle It and Etch A Sketch, despite the fact that some 600,000 Doodle It units have been sold since January 1991. Ohio Art has received no returns or complaints from customers who felt misled about their purchase. Nor has Galoob received any such returns or complaints.

Ohio Art was able to dredge up the testimony of just one purchaser—and she recognized that Doodle It and Etch A Sketch were of differing origin and chose to buy the Ohio Art product.

41. Both Etch A Sketch and Doodle It are drawing toys for children ages four and up. Both products are marketed in the same channels (primarily the same stores), and they are usually located in the same aisle of each store. Even there, however, Doodle It is normally not displayed adjacent to Etch A Sketch. Instead it is typically located among other Pocket Play products on a J-hook on a wall, together with other small low-cost activity toys.

42. There is no evidence that Galoob intended to confuse consumers in designing Doodle It. It was not aware of the Mark registration when it designed and started selling its product. Nor did Galoob copy (or adopt a confusingly similar) shape, color, size or any other aspect of Etch A Sketch. It selected a name—"Doodle It"— that bears no resemblance to the name "Etch A Sketch." To be sure, Galoob designed a toy that *works like* an Etch A Sketch toy, but that is entirely permissible now that Ohio Art's protective patents have expired.

43. In summary, Doodle It has a different shape, sports different colors and comes in different packaging with different labels from the corresponding attributes of Etch A Sketch. On the evidence before this Court, it is very unlikely that consumers will be confused over the source or sponsorship of Doodle It.

*Likelihood of Confusion: Trade Dress*

44. As the preceding Findings indicate, the trade dress for Etch A Sketch and the trade dress for Doodle It are substantially different. Although as already stated the products are marketed in the same channels, they have different shapes, sizes and colors, the packaging is different, the labels look and sound different and their prices are quite different.[10]

---

**10.** To the extent that the overall presentation of Etch A Sketch may be said to have "inherent distinctiveness," so that it might be separately actionable on trade dress infringement grounds

45. Ohio Art also introduced no survey evidence on the issue of likelihood of confusion due to similarity of trade dress. And as was true with respect to the Mark, there is no record evidence of actual confusion stemming from trade dress either.

46. As with the Mark, there is no evidence of improper intent on Galoob's part in creating the trade dress for Doodle It. It did not copy (or adopt a confusingly similar) shape, color, size, packaging, labels or any other aspect of the Etch A Sketch trade dress.

47. In summary, the same differences that negate any prospect of likelihood of confusion as between the Doodle It configuration and the Mark (see summary Finding 43) are equally compelling as to the comparative trade dresses of the two products. Hence there is also no likelihood of confusion over the source or sponsorship of Doodle It due to its trade dress, with its sharp differences from the Etch A Sketch trade dress.

*Functionality of the Mark*

48. There is a presumption of non-functionality of the product configuration—the Mark—as a result of its registration by the PTO on the Principal Register. But as with the presumption of secondary meaning, that presumption has been entirely rebutted by evidence presented to this Court. Thus Ohio Art is not likely to prevail on this issue at trial either.

49. Despite Ohio Art's vigorous protestations to the contrary, the rectangular shape of the drawing screen is highly functional—that is, the rectangular shape is dictated by Galoob's natural desire and decision to make the optimum use of the internal mechanism depicted in the Grandjean and Clark patents, as well as two other patents in evidence [11]—a mechanism that moves a stylus along two rods set perpendicularly to one another. Any other screen shape would:

(a) require a change in the mechanism (such as the parallelogram in P.Ex. 24B),

(b) be less useful because the stylus would not be able to reach to all areas of the screen (such as the "scalloped" shape in P.Ex. 24B), or

(c) be less useful because the stylus would travel under the frame out of sight (such as in P.Exs. 25 and 26), an undesirable feature in a drawing toy.

50. Relatedly there are only a few shapes for the frame of the toy that can be manufactured economically,[12] given the shape of the cord and rod mechanism that moves the stylus. One is the pure rectangle shown in the Mark. Another is the shape of Pocket Sketcher and of the hypothetical device created by Ohio Art's experts, each of which has a basically rectangular housing with the corners cut off to create an octagonal shape (though not a regular octagon). Third—and incidentally the most efficient of all in its use of materials—is the shape of Doodle It, with rounded top corners and with an area cut out of each bottom corner to accommodate the knobs.

51. No weight is to be ascribed to Ohio Art's additional hypothetical drawings of housing shapes (P.Ex. 24B) for at least three reasons: because Ohio Art introduced no evidence of the cost of manufacturing devices with those shapes, because no drawing device with the Etch A Sketch mechanism has ever been commercialized with any such shape, and because of the factors identified in Findings 49 and 50. Ohio Art's expert conceded what commonsense observation alone would appear to teach—that many of the shapes are radical and would not fare well on the market.

52. There are only a few places on the toy's frame where the control knobs can be

(see *Taco Bell*), Doodle It does not impinge on that distinctiveness and is therefore noninfringing.

11. D.Exs. 11 and 12 are patents assigned to Buddy L Corporation, which depict drawing devices similar to Etch A Sketch but with minor improvements.

12. "Economically" is of course a comparative term, connoting value received for what is spent. Here this Court takes into account the same considerations of optimum utility that have been referred to in Finding 49.

located and still provide a toy that operates according to the teaching of the Grandjean patent, that is easy for a child to use and that is economical to manufacture. All drawing toys utilizing the Grandjean mechanism that have been commercialized since 1960 have placed the knobs in one of three places: in the bottom corners (Etch A Sketch, Travel Etch A Sketch, Easy Writer, Easy Writer II, Better Sketch, Pocket Sketcher and Doodle It), in the middle of the vertical sides (Mini Telecran) or in the top corners (Pocket Artist).[13]

53. There was no agreement among the witnesses as to which of the three knob positions was easiest for children to manipulate. All however testified that a design such as Doodle It that enables the consumer to rotate the knobs while holding the toy in his or her hands is more useful. Thus the knob placement on Doodle It is utilitarian and not merely ornamental.

54. Similarly, the shape of the knobs on Doodle It also serves a utilitarian purpose. Round knobs are easier for children to manipulate than other shapes. They are also much less expensive than levers or joysticks, which cannot be employed unless electric motors, wiring and gears are added.

55. Ohio Art's Mark depicts a product configuration that had already appeared in the drawings of four utility patents. While none of those patents expressly claims a utilitarian advantage for the shape or specifically claims the shape itself, all of them refer to it as the preferred embodiment of the invention. In contrast to Ohio Art's conduct as to its Ghost Writer product, which its Director of International Project Development James Watson testified had a unique parallelogram shape, it never sought a design patent on the Etch A Sketch shape.

56. Four of the five devices that Ohio Art cited to the PTO as evidence of asserted non-functionality are not relevant to that issue.[14] Because those four toys use mechanisms *different* from that shown in the Grandjean and Clark patents, the fact that all four have a different frame shape or knob configuration does not negate the functionality of the Etch A Sketch configuration. Those devices do not bear on the question whether a device that *does* use the mechanism depicted in those patents can be produced using a different design that is both economical to manufacture and easy for children to use.

57. None of the advertising of Etch A Sketch has touted any utilitarian advantages of its shape. Nor has that advertising mentioned any ornamental or arbitrary aspect of the shape as such.

58. Ohio Art did not come upon the idea of claiming the Etch A Sketch configuration as a trademark until near the end of the term of the Clark patent, after the Grandjean patent had expired. In effect Ohio Art is seeking to use the Mark as a means to extend the now-expired monopoly that had been conferred on it by the patents. It thus attempts to create a perpetual monopoly that would prevent competition by anyone who would like to make a perfectly legal use of the mechanism taught by those patents, and who would like to do so in a wholly functional manner that employs the patents' preferred embodiment. However, this Court need not now determine whether the Mark is rendered invalid as a matter of law by reason of that effort on Ohio Art's part.

59. In sum, all of the features of Doodle It that Ohio Art claims are infringing are influenced—if not fully dictated—by functional considerations, including the expense of materials and the ease of use by

---

**13.** Ohio Art presented an alternative design (P.Exs. 25 and 26) showing the knob placement one third of the way along the horizontal sides. However, it introduced no evidence of the cost of making such a toy or of its marketability.

**14.** Apparently the PTO was under the mistaken belief that each of the four devices functioned in the same way as Etch A Sketch, for Ohio Art represented that they "perform the same func-

tion" and stated that Easy Sketch "operates just like Applicant's toy." Yet all the experts agreed that the two round toys (Skeedoodle and Tap N' Doodle) do *not* use the Grandjean mechanism at all, while the two devices with levers instead of knobs (Easy Sketch and Electra Doodle) must be run by electric motors, which add substantially to the cost of the toy.

children. For that reason, if the Mark were to be interpreted broadly enough to encompass the very different shape utilized by Doodle It (a highly doubtful assumption at best), the Mark would most likely be found at trial to be functional in that respect.

*Irreparable Injury*

60. Ohio Art has offered no reasonable explanation for its delay in seeking extraordinary equitable relief.[15] That delay, coupled with Galoob's change of position in the meantime (see Finding 63), would alone support the denial of such relief. But as ensuing Findings reflect, there is more.

61. Ohio Art has presented no evidence of actual confusion between Etch A Sketch and Doodle It, and it concedes that its sales of Etch A Sketch have actually increased since Doodle It was introduced in 1991. Thus there is no evidence of any injury to Ohio Art arising out of sales of Doodle It, much less any irreparable injury.

62. Ohio Art has claimed that Doodle It may be an inferior product, so that Etch A Sketch's goodwill might be damaged by sales of Doodle It.[16] Ohio Art's Chairman of the Board Killgallon testified that he did not expect any problems to surface with Doodle It for up to three years—a substantial period of time for a toy costing only about $5, and well beyond the period required to conduct a trial on the merits in this action. Most importantly, because of the absence of any evidence of confusion or of the likelihood of confusion, it cannot be assumed that consumers will blame Ohio Art rather than Galoob for any perceived lack of quality in the Doodle It product. Accordingly there is again no showing of any injury (let alone irreparable injury) to Ohio Art.

*Balance of Hardships*

63. Galoob and its codefendants have an established customer base for Doodle It and for the two related products launched this year, Power Doodle It and Mini Doodle It. Any injunction would severely impair defendants' customer goodwill. In addition, an injunction would cause millions of dollars of lost sales of the Doodle It products. Galoob's sunk costs (principally tooling and R & D costs) have also been substantial, exceeding $180,000.

64. As already shown, Ohio Art will not incur any legally cognizable damage if an injunction is denied. Findings 61 and 62 reflect that there is no evidence of harm to its goodwill or sales as a result of the marketing of Doodle It. Ohio Art cannot legitimately bootstrap itself by claiming the likelihood of confusion between Doodle It and Ohio Art's later-marketed new product—Travel Etch A Sketch. Ohio Art's concern about competition between Doodle It and that new product is simply not relevant to the propriety of preliminary injunctive relief.

*Public Interest*

65. There is a strong public interest in the right of every prospective competitor to utilize an invention after the expiration of a patent, so that the public may benefit from the operation of a free competitive market once the patent monopoly terminates. That interest disfavors an injunction here.

66. There is also a strong public interest in the availability of such competing

---

**15.** Ohio Art's stated reason for delay is that it had been in litigation with another claimed infringer since October 1990 and could not afford to pursue more than one lawsuit at the same time. That other litigation ended with a consent decree in December 1991, and this action was brought in February 1992. That makeweight argument is unpersuasive as an explanation of the many months of silence on Ohio Art's part, during which it did nothing to prevent or forestall Galoob's active development and marketing of its own toy at substantial expense, as the result of which Galoob established substantial customer goodwill (see Finding 63).

**16.** Evidence at the Hearing established that Doodle It has passed all required safety tests and that the powder in Doodle It is the same as that used in the various other products on the market, including Etch A Sketch and Easy Writer. To the extent that Etch A Sketch may meet more demanding standards, however, the possibility of damage to its goodwill by a confusingly similar product of less high quality could remain. Hence this Finding rests instead on the absence of any likelihood of confusion.

products at different price ranges. That interest also disfavors an injunction here.

67. As a possibly countervailing factor, there is to be sure a strong public interest in preventing confusion as to the source of products. However, there is no evidence of confusion or of the likelihood of confusion here—that factor is simply not present so as to dilute the force of the strong factors identified in Findings 65 and 66, which operate to defeat the granting of injunctive relief to Ohio Art.

### Conclusions of Law [17]

*Jurisdiction and Venue*

1. Jurisdiction is conferred on this Court by Section 1121, 28 U.S.C. §§ 1331 and 1338 and principles of supplemental jurisdiction under 28 U.S.C. § 1367. Venue is proper in this judicial district under 28 U.S.C. § 1391(a).

*Preliminary Injunction Standards*

2. Ohio Art seeks an order preliminarily enjoining defendants from manufacturing and selling Doodle It. That extraordinary form of relief is subject to Ohio Art's satisfaction of well-settled standards. It must show a likelihood of success on the merits; the inadequacy of any remedy at law; irreparable harm to Ohio Art from a denial of the preliminary injunction; the balancing of that harm against the harm to defendants if injunctive relief is denied, with that balancing favoring Ohio Art; and the absence of any disservice to the public interest if the injunction is granted (*Schwinn Bicycle Co. v. Ross Bicycles, Inc.*, 870 F.2d 1176, 1181 (7th Cir.1989) [18] ).

**17.** Defendants have tendered proposed Conclusions addressing their motion for summary judgment. These Findings and Conclusions, however, are limited to matters that bear on Ohio Art's motion for preliminary injunctive relief. Thus no inference should be drawn from the silence of these Findings and Conclusions as to the summary judgment issues. Counsel for the parties are notified that a telephonic status conference will be held at 1:30 p.m. July 24, 1992 to discuss any further procedures that may be required to deal with defendants' Rule 56 motion (arrangements for the placing of that conference call shall be made jointly by the parties' counsel).

*Likelihood of Success on the Merits*

3. To prevail on a claim of trademark or trade dress infringement, Ohio Art must establish either that its mark or dress has acquired secondary meaning *or* that its mark or dress is inherently distinctive (*Two Pesos*, —— U.S. at —— - ——, 112 S.Ct. at 2758–59). Ohio Art must also establish the likelihood of confusion (*id.* at ——, 112 S.Ct. at 2756)—"that consumers will be 'likely confused' as to the source of the product because of the similarity of the products' appearance" (*Schwinn*, 870 F.2d at 1182). Even if the first two requirements are established, Ohio Art still cannot prevail if its mark or dress is functional (*id.* at 1183).

#### A. Secondary Meaning

4. While secondary meaning is generally presumed from federal registration, "[t]his presumption may, of course, be overcome by proof of descriptiveness, or by proof of genericness" (*Liquid Controls Corp. v. Liquid Control Corp.*, 802 F.2d 934, 936 (7th Cir.1986)). This Court has held a mark descriptive if it imparts information directly (*Spraying Sys. Co. v. Delavan, Inc.*, 762 F.Supp. 772, 778 (N.D.Ill. 1991)). Descriptiveness of the mark is further demonstrated by third-party use (*id.*).

5. "Simple geometric shapes" are too commonplace to be deemed distinctive without proof of secondary meaning (*Blau Plumbing, Inc. v. S.O.S. Fix–It, Inc.*, 781 F.2d 604, 610 (7th Cir.1986)). As for color, *Spraying Sys.*, 762 F.Supp. at 780 has held, quoting *Life Savers Corp. v. Curtiss Candy Co.*, 182 F.2d 4, 9 (7th Cir.1950):

**18.** Although *Schwinn* framed the test as one involving four parts rather than five, the opinion there drew upon the extended discussion in *Roland Machinery Co. v. Dresser Indus., Inc.*, 749 F.2d 380 (7th Cir.1984) as its source. This Court regularly uses *Roland Machinery* as its referent because that case contains the most thoughtful treatment of the several factors, and it will do so here as well in preference to *Schwinn Bicycle*'s slight reordering and partial merging of the issues.

[C]olor per se can never be protected, and color is protectible only "in connection with some definite arbitrary symbol or design."

■ 6. "Trade dress" was defined by the Court of Appeals in *Two Pesos* in much the same fashion that this Court used in *Spraying Sys.*, 762 F.Supp. at 782—as the Supreme Court in *Two Pesos* quoted the lower court's definition (—— U.S. at —— n. 1, 112 S.Ct. at 2755 n. 1), "essentially [the product's] total image and overall appearance." And quoting from and citing to other sources, *Two Pesos, id.* went on:

It "involves the total image of a product and may include features such as size, shape, color or color combinations, texture, graphics, or even particular sales techniques."

However, the rebuttable presumption that is accorded registered marks does not apply to trade dress, for which secondary meaning or distinctiveness must be established (*Spraying Sys.*, 762 F.Supp. at 782–83).

7. It is well settled that "[p]roduct packaging which is commonplace and functional cannot be legally protectible" (1 J. Thomas McCarthy, *Trademarks & Unfair Competition* § 7:28, at 255 (2d ed. 1984); accord, *Original Appalachian Artworks, Inc. v. Blue Box Factory (USA) Ltd.*, 577 F.Supp. 625, 631 (S.D.N.Y.1983) (transparent plastic front window on the box containing Cabbage Patch doll unprotectible as "commonly used, functional device for displaying dolls")).

■ 8. Even length of use and promotion of a mark or dress are not dispositive of secondary meaning, especially where the trade dress is a "simple geometric configuration" and there is nothing to suggest that consumers associate the configuration mark or dress with one source

(*Eldon Indus., Inc. v. Rubbermaid, Inc.*, 735 F.Supp. 786, 817–18 (N.D.Ill.1990)).

9. Secondary meaning cannot be established by advertising that merely pictures the product and does nothing to emphasize the mark or dress (*id.* at 818 (another case dealing with a plaintiff that sought to obtain a monopoly over a product's configuration); *Textron, Inc. v. United States Int'l Trade Comm'n*, 753 F.2d 1019, 1027 (Fed. Cir.1985) (no evidence that "promotions focused buyers' attentions on the shape of the machine or that the design of the column and ram was featured in any way")). "To establish secondary meaning, a manufacturer must show that, in the minds of the public, the *primary significance* of a product feature or term is to identify the *source of the product* rather than the product itself" (*Inwood Labs., Inc. v. Ives Labs., Inc.*, 456 U.S. 844, 851 n. 11, 102 S.Ct. 2182, 2187 n. 11, 72 L.Ed.2d 606 (1982) (emphasis added)).

10. "Where a configuration of a product is displayed with and identified by word marks, the burden to show that the configuration serves a trademark function is greater, since the usual way for consumers to identify and distinguish the source of products is by marks that can be verbalized" (3 Louis Altman, *Callmann Unfair Competition, Trademarks and Monopolies* § 18.12, at 136 n. 2 (4th ed. 1983 rev'n)).[19]

11. It is irrelevant that Ohio Art may have intended—through the promotion of Etch A Sketch—that the product configuration as well as the product name be a source identifier. For that purpose the "desires or intentions of the creator, or even the owner, are irrelevant. Instead, it is the attitude of the consumer that is important" (*Ellison Educ. Equip., Inc. v. Accu–Cut Sys., Inc.*, 769 F.Supp. 1090,

---

**19.** Ohio Art has submitted an affidavit from *Callmann*'s current editor Altman to the effect that the now-expired Grandjean and Clark utility patents that had once insulated Etch A Sketch from competition do not necessarily "impeach the validity of the [Mark's] registration" or Ohio Art's other intellectual property claims because the functions taught by the patents "are entirely compatible with" configurations other than that depicted in the Mark. Quite apart from any comment on the risks that are inherent in a practicing lawyer's authorship of a treatise or asserting a professional opinion such as that stated in the affidavit (lest he or she may be called on in some later case to express a view contrary to the currently-stated opinion), nothing said in that affidavit "impeach[es] the validity" of these Findings and Conclusions.

1096 (D.Neb.1991), quoting *Co–Rect Prods. v. Marvy! Advertising Photographs,* 780 F.2d 1324, 1332 (8th Cir.1985)).

### B. *Likelihood of Confusion*

■ 12. Important factors in determining likelihood of confusion are the similarity of the marks, the similarity of the products, the area and manner of concurrent use, the degree of care likely to be exercised by consumers, the strength of the mark or dress, evidence of actual confusion and the intent of the alleged infringer (*Source Servs. Corp. v. Chicagoland Job-Source, Inc.,* 643 F.Supp. 1523, 1527 (N.D.Ill.1986), citing *Helene Curtis Indus., Inc. v. Church & Dwight Co.,* 560 F.2d 1325, 1330 (7th Cir.1977)).

13. "[S]ide-by-side comparison is not the correct test" for determining the similarity of the marks (*Sterling Drug Inc. v. Lincoln Labs., Inc.,* 322 F.2d 968, 971 (7th Cir.1963)). Instead the test is the degree of similarity "taken in a marketplace context" (*Source Servs.,* 643 F.Supp. at 1528). *Sterling Drug,* 322 F.2d at 971 (emphasis in original) put it in terms of "the purchasing public's state of mind when confronted by somewhat similar [marks] *singly* presented."

14. Labeling of the products, packaging and promotional materials with the competing logos is an important factor in determining whether the consumer is likely to be confused as to the source of the product (*Eldon Indus.,* 735 F.Supp. at 796 (logos prominently displayed in catalogs, on packages and on products); *Washington Nat'l Ins. Co. v. Blue Cross & Blue Shield United,* 727 F.Supp. 472, 475 (N.D.Ill.1990) ("[i]f the source ... is identified, then confusion will be minimized—even if the marks are used in connection with the same type of product"); *Keystone Camera Prods. Corp. v. Ansco Photo–Optical Prods. Corp.,* 667 F.Supp. 1221, 1232 (N.D.Ill.1987) (no likelihood of confusion where defendant "presented its ... name prominently on its [product], used different shades of color, different color combinations and different color placements ... from those used by plaintiff")).

15. Because " '[s]trong' marks are magnets, drawing consumers' attention away from the characteristics of a product or service and toward its producer or provider," while " '[w]eak marks have no better than a blurred effect in that respect," the strength of the mark or dress must be considered in evaluating likelihood of confusion (*Source Servs.,* 643 F.Supp. at 1531). In that respect any third-party use of a mark or dress is reflective of the weakness of a mark or dress (*Washington Nat'l Ins.,* 727 F.Supp. at 476).

16. It is reasonable and proper to infer from the absence of any evidence of actual confusion that there is no likelihood of confusion (*S.C. Johnson & Son Inc. v. Lever Bros. Co.,* 19 U.S.P.Q.2d 1027, 1036–37, 1991 WL 217665 (E.D.Wis.1991) (citing a host of cases for the proposition that "where both parties have extensively marketed their products, the absence of actual confusion is highly persuasive evidence that confusion is not likely"); *Washington Nat'l Ins.,* 727 F.Supp. at 477)).

### C. *Functionality*

17. This case involves an asserted mark covering the shape of a product itself—it is not a "container of goods" case such as *In re Morton–Norwich Prods., Inc.,* 671 F.2d 1332, 1336 (C.C.P.A.1982) ("it should be borne in mind that this is not a 'configuration of *goods*' case but a 'configuration of the *container for* the goods' case") (emphasis in original). It is particularly important in cases involving asserted trademarks in product designs to delineate between protectible and unprotectible elements, so as to avoid (1) conflict with the patent laws and (2) the impedance of competition (*Stormy Clime Ltd. v. ProGroup, Inc.,* 809 F.2d 971, 977–78 (2d Cir.1986) ("Since trademark protection extends for an unlimited period, expansive trade dress protection for the design of products would prevent some functional products from enriching the public domain" (*id.* at 978)).

18. For this Court to recognize the overall product configuration of the Etch A Sketch toy as a trademark, the *entire* design must be arbitrary or nonfunctional

(*Textron*, 753 F.2d at 1025, emphasizing "entire" ("The reason for this rule is self-evident—the right to copy better working designs would, in due course, be stripped of all meaning if overall functional designs were accorded trademark protection because they included a few arbitrary and nonfunctional features")). Because at the very least the rectangular drawing screen of the Etch A Sketch toy is functional, it is highly questionable that the overall configuration was entitled to registration.[20]

19. *Schwinn*, 870 F.2d at 1189 teaches that "[a] feature is functional if it is one that it [sic] costly to design around or do without, rather than one that is costly to have." And *W.T. Rogers Co. v. Keene*, 778 F.2d 334, 339 (7th Cir.1985) tells us that "if the feature [in this instance the product shape itself] is not ornamental or fanciful or whimsical or arbitrary, but is somehow intrinsic to the entire product consisting of this manufacturer's brand and his rivals' brands, trademark production [sic] will be denied."

20. Where there are a limited number of alternative designs available to competitors, no one of those designs should be taken from the public domain through trademark protection (*Keene Corp. v. Paraflex Indus., Inc.*, 653 F.2d 822, 827 (3d Cir.1981) ("the selection of a luminaire design does not have the unlimited boundaries as does the selection of a wine bottle or ashtray design, and the court's finding that competition will be stifled is again not clearly erroneous"); accord *In re Bose Corp.*, 772 F.2d 866, 872 (Fed.Cir.1985) ("If the feature asserted to give a product distinctiveness is the best, or at least one, of a few superior designs for its *de facto* purpose, it follows that competition is hindered"); *Morton–Norwich*, 671 F.2d at 1341 ("is it the best or one of a few superior designs available?")).

21. Functionality does not depend on whether other *possible* designs are feasible. Rather the test is whether the particular features claimed as a trademark are necessary for "effective competition" (*Schwinn*, 870 F.2d at 1191; accord, *Keene Corp.*, 653 F.2d at 827 ("merely because there are other shapes and designs 'which defendant could use and still produce a workable' product, the design used is not thereby non-functional"); *Tyco Indus. Inc. v. Lego Sys. Inc.*, 5 U.S.P.Q.2d 1023, 1039, 1987 WL 44363 (D.N.J.1987), *aff'd without published opinion*, 853 F.2d 921 (3d Cir. 1988) ("Simply because other configurations are available or feasible does not render the design non-functional").

22. It is also some evidence of functionality that the claimed shape is depicted as the preferred embodiment of at least four utility patents. And it cannot be ignored that Ohio Art itself adopted the very same shape shown in the drawings of those patents for its own commercial embodiment. As stated in *Cable Elec. Prods., Inc. v. Genmark, Inc.*, 770 F.2d 1015, 1031 (Fed. Cir.1985):

> A manufacturer may choose in its commercial embodiment of a patented device to less than faithfully replicate the exemplary depiction of a claimed embodiment shown in the figures of the patent. Hence, for purposes of evaluating the existence or impact of product copying, the relevance of patent figures depends on the extent to which their appearance is replicated in the actual marketplace product of the patentee.

23. It is not relevant, much less dispositive, that the particular shape of Etch A Sketch is not an element of the patent claims. Instead the issues are (a) whether that shape is *one* embodiment of the claimed invention (it is) and (b) whether the shape is ornamental (it is not). It remains true today, as nearly 70 years ago (*William H. Keller, Inc. v. Chicago Pneumatic Tool Co.*, 298 F. 52, 57 (7th Cir.1923) (emphasis added)), that:

> [I]f the structure which the patentee makes pursuant to his patent is *an embodiment* of the elements of the claims or a claim therein, and contains no artis-

---

**20.** As the Findings reflect, the screen is by no means the only functional aspect of the configuration over which Ohio Art seeks to obtain a monopoly via the Mark. No inference to the contrary should be drawn from singling out the screen in this Conclusion.

tic or distinguishing marks, but is strictly a utilitarian article, where simplicity of structure and cheapened cost of production are inherent in the combination and constitute its virtue, then the mere fact that a Chinese copy is made does not impose on the maker the burden of establishing his good faith or the absence of unfair trade methods.

24. It is of course true that the Etch A Sketch product configuration was unique in 1960, when Ohio Art began marketing the toy. But that does not establish its nonfunctionality, particularly because that uniqueness resulted from the existence of a basic utility patent. No product design that "is essentially adapted to the function it performs" and is not "arbitrary or fanciful" achieves trademark status (*Textron,* 753 F.2d at 1027). Here the shape of Etch A Sketch is closely adapted to the function performed by the patented apparatus.

25. Moreover, the fact that Ohio Art itself did not attribute any trademark significance to the shape of its product until 1987—a few years before the Clark patent expired—is added evidence that the shape is functional and does not have secondary meaning (see generally *Singer Mfg. Co. v. June Mfg. Co.,* 163 U.S. 169, 16 S.Ct. 1002, 41 L.Ed. 118 (1895) (in part *Singer, id.* at 180–81, 16 S.Ct. at 1006–07 teaches that such a coincidence in time "tends to create a strong implication" of the patentee's intention to perpetuate the expiring patent monopoly); *Textron,* 753 F.2d at 1026).

26. *Schwinn,* 870 F.2d at 1191 reaffirms the holding in *W.T. Rogers* that a feature may also be functional (though it is not automatically so) due to its pleasing aspect to consumers. As *W.T. Rogers,* 778 F.2d at 347 put it:

> Though a producer does not lose a design trademark just because the public finds it pleasing, there may come a point where the design feature is so important to the value of the product to consumers that continued trademark protection would deprive them of competitive alternatives; and at that point the protection ceases.

Absent the protection of a design or utility patent, therefore, Ohio Art cannot prevent "the loss of a competitive advantage stemming from the exclusive possession of a popular design" (*id.* at 348).

27. From the evidence adduced at the Hearing, it appears that defendants are highly likely to demonstrate at trial that most if not all of the claimed features in Etch A Sketch are functional under the test in *W.T. Rogers, id.* at 347 (paraphrased to fit this case):

> If many consumers consider the [rectangular screen and housing, with two knobs in lower corners] not the distinctive sign of a particular brand of [drawing toy] ... but a design feature enhancing the attractiveness, value, and hence utility in the economic sense ..., this is evidence bearing on the functionality of the feature.

It is likewise true that "trade dress protection does not extend to features already shared by different brands on the market" (*Schwinn,* 870 F.2d at 1190). Because a number of other products utilize a square or rectangular drawing screen, a square or rectangular housing and round knobs in the bottom corners, those elements cannot be protected by Ohio Art under a theory of trade dress.

*Inadequacy of Remedy at Law*

28. As *Roland Machinery,* 749 F.2d at 386 points out:

> The absence of an adequate remedy at law is a precondition to any form of equitable relief.

Actions claiming the violation of intellectual property rights frequently satisfy that standard, for quantifying the damages caused by the unlawfully competitive activity—though such damages are very real—may pose a real problem. Although *Hyatt Corp. v. Hyatt Legal Services,* 736 F.2d 1153, 1158 (7th Cir.1984) spoke in the context of irreparability of injury from the dilution of a trademark, its statement applies with equal force to the inadequacy of a remedy at law here—what follows omits a citation and a quotation, the latter taken from this Court's opinion in *Instrumental-*

*ist Co. v. Marine Corps League,* 509 F.Supp. 323, 332 (N.D.Ill.1981):

> We note that it is the very nature of dilution to gnaw away insidiously at the value of a mark.... Such an injury would be remarkably difficult to convert into damages. "[T]here is no effective way to measure the loss of sales or potential growth—to ascertain the people who don't knock on the door or to identify the specific persons who do not [return] because of the existence of the infringer."

### Irreparability of Harm

■ 29. While irreparable harm is generally presumed in the usual trademark infringement case, that presumption is overcome where the plaintiff delays in seeking injunctive relief (*Stokely–Van Camp Inc. v. Coca–Cola Co.,* 2 U.S.P.Q.2d 1225, 1227, 1987 WL 6300 (N.D.Ill.1987) ("extraordinary remedy" of preliminary injunction denied where plaintiff chose to wait *three months* before filing suit while defendant was spending substantial amounts to market its product)). It can be inferred from the plaintiff's delay that there is no threat of irreparable harm (*Borden, Inc. v. Kraft, Inc.,* 224 U.S.P.Q. 811, 822, 1984 WL 1458 (N.D.Ill.1984), quoting *Amstar Corp. v. Domino's Pizza, Inc.,* 615 F.2d 252, 265 (5th Cir.1980) ("A trademark owner that strongly believed its customers were being deceived would hardly have remained idle for such an extended period of time") and rejecting "extraordinary remedy of preliminary injunctive relief" where plaintiff delayed bringing suit for almost six months). As already stated, the fact that Ohio Art was engaged in other litigation is irrelevant to the issue of irreparable harm. Nor are trademark cases cited by Ohio Art, dealing with the issue of laches, persuasive on the issue of irreparable harm.

### Balancing of Relative Harms

30. Injunctive relief is not available "[w]here a party is simply trying to obtain a commercial advantage ..." (*Borden,* 224 U.S.P.Q. at 823, 1984 WL 1458). Such relief is particularly inappropriate here, where the advantage that Ohio Art is seeking to obtain is for the direct benefit of its *later*-marketed product, Travel Etch A Sketch—which is the head-to-head competitor of Doodle It and is trying to cut into Doodle It's already-established market entry and business momentum. But even apart from that, the harm to Galoob and its codefendants if preliminary injunctive relief were to be wrongfully granted far outweighs the harm that Ohio Art would sustain if such relief were wrongfully denied. And that would remain true even if (contrary to what Conclusion 29 reflects) it were possible to identify some degree of irreparable harm to Ohio Art. Finally, the sliding scale approach described in *Roland Machinery,* 749 F.2d at 387–88 strongly favors defendants and disfavors Ohio Art, because *both* of the weights placed in the scales—the likelihood of success on the merits and the balance of relative harms—tip so heavily toward defendants (rather than requiring a comparative evaluation of counterweights).

### Public Interest

31. It would not serve the public interest to grant an injunction where there is "minimal likelihood of ... confusion" (*Eldon Indus.,* 735 F.Supp. at 798). Indeed, the public's interest in obtaining the "lowest priced goods" and in "avoiding monopolies and in encouraging, not stifling, competition" is best served in this case by the denial of an injunction (*Calvin Klein Cosmetics Corp. v. Lenox Labs., Inc.,* 815 F.2d 500, 505 (8th Cir.1987)).

\* \* \* \* \* \*

■ Ohio Art must establish each of five conditions to obtain preliminary injunctive relief. It has succeeded in showing only one of those: the inadequacy of its remedy at law if it were otherwise entitled to relief. In every other respect it has failed. In this contest in which even one strike (either swinging or called) is "out," Ohio Art has thus sustained not one but four strikes. Its motion for a preliminary injunction is denied.